THE STATE OF KANSAS, *ex rel.* C. REED, *County Attorney,* v. COMMISSIONERS OF MARION COUNTY, *et al.*

1. COUNTY COMMISSIONERS, *No Power to Appropriate for County Buildings, Fund for Current Expenses.* The board of county commissioners of a county have no power to appropriate the fund raised by taxation to defray county charges and expenses of the current year, to the erection of permanent county buildings.

2. PERMANENT COUNTY BUILDINGS; *Construction Fund, how Provided.* Ample provisions are made in the statute for the creation of special funds to construct permanent county buildings, by authorizing the commissioners to borrow money, and assess taxes therefor; but such funds can only be provided, after the consent of the electors of the county has been given, in the mode pointed out by the statute.

3. UNAUTHORIZED ACTS OF COMMISSIONERS; *Prevention.* Where a board of county commissioners have made an order for the erection of permanent county buildings; have adopted plans and specifications; have directed the county clerk to advertise for bids for said work, and are about to enter into contracts therefor, on behalf of the county, and the

necessary prerequisites prescribed by the statute to incur obligations for the erection of this class of buildings have not been complied with, *held,* that such acts are illegal and unauthorized, and are proper subjects of the preventive jurisdiction of equity, when its exercise is invoked by suitable authority.

4. COUNTY ATTORNEY; *Action in Name of the State.* Such a suit may be brought in the name of the state, and the county attorney of the county in which the buildings are to be erected may commence and prosecute the action for the state.

### *Error from Marion District Court.*

THIS was an application for an injunction to restrain the board of county commissioners of Marion county from letting a contract to erect county buildings at Marion Centre, and from taking any proceedings under the following order of the board, entered of record the 9th of August, 1878, to wit:

"Therefore, it is resolved and determined by said board of county commissioners, in order to provide suitable rooms for county purposes, and also to furnish suitable jail facilities for the confinement and maintenance of prisoners in said county, and a more secure and safe depository for the public records of said county, to repair, remodel and make such extensions and additions to the present court-house building, situated in Marion county, as may be necessary for said purposes. The plans and specifications, filed this day with the county clerk, and marked 'Exhibit A,' are hereby adopted by the board as the plans and specifications to be followed in making such repairs and additions."

The specifications called for a house 34x54 feet, and 34 feet high, with a tower of some 30 feet; the vault was to be $9\frac{1}{2}$x20 feet. The first story was to contain four rooms, each $16\frac{1}{2}$x$14\frac{1}{2}$ feet, with hall running through the center. The second story was to contain one room, 30x50 feet, to be used as a court room. The stone for the second story was to be hard, bluff limestone.

On the hearing of the application, on September 28, 1878, it was shown that C. Reed was the duly-elected, qualified, and acting county attorney of Marion county; that the county of Marion was a duly-organized county; that Samuel Harri-

son, L. P. Alspaugh, and W. T. Hoblitzell were the duly-elected, qualified, and acting county commissioners of the county; that on December 29, 1866, a county-seat election was held, and a majority of votes were cast in favor of locating said county seat on the southeast corner of the southeast quarter of section 31, in township 19, south, of range 4, east, and that afterward the board of county commissioners did erect permanent county buildings upon the northwest quarter of section 5, in township 12, south, of range 4, east; that said buildings have been so used continuously for county purposes since that time, and cost about $3,000; that August 9, 1878, the present board of county commissioners met at or about midnight, in session, with closed doors, without any public notice, without the presence of the county attorney, and made the order above set forth, and directed the county clerk of the county to publish a notice to contractors, in the *Marion County Record*, for thirty days, that proposals would be received until September 25, 1878, for the construction of the buildings named in said order; that the so-called repairs were in fact for the erection of new permanent county buildings, at a cost of about $7,500; that no tax had been levied or money borrowed for the purpose of defraying the cost of such buildings; that no vote had been had to authorize any appropriation of money, or the levying of any tax, or the borrowing of any money for the buildings; that the question of erecting permanent county buildings in the county had never been submitted to a vote of the electors of the county; that the question of altering or adding to the present county building had never been submitted to a vote of the electors of said county; that the county building in use in Marion Centre was erected at the cost of the county, without protest from any one, and the building has been used for county purposes ever since; that such building is now insufficient; that the offices for keeping the public records are unsafe, and that there is no jail or jury room; that E. R. Trenner was the duly-elected, qualified, and acting county clerk; that said board of county commissioners intended to

convene as a board to open bids for the work and enter into contracts therefor. The district judge refused the application; and decided that the board had the power to make the order for the reception of bids; that they had the power to make contracts for the erection of county buildings, without submitting the question to a vote of the people, in all cases where no tax was assessed for that purpose; and that they had the power to pay for said buildings out of any money in the treasury, levied and collected to defray the current expenses of the county. Exceptions were properly taken to the order and ruling of the judge. The case is now here, at the instance of the plaintiff, for review.

*C. Reed*, county attorney, *Ruggles, Scott & Lynn, John Martin,* and *Willard Davis*, attorney general, for The State:

The board of county commissioners has such powers, and those alone, as are given to it by the statute. This is an axiom. To the statute, therefore, we must look to see whether the proceedings in this case shall stand or fall, and whether the injunction asked for herein shall be granted or refused. Among other powers possessed by county boards are these:

"*Third:* To purchase sites for, and to build and keep in repair county buildings, and cause the same to be insured in the name of the county treasurer, for the benefit of the county; and, in case there are no county buildings, to provide suitable rooms for county purposes. *Fourth:* To apportion and order the levying of taxes as provided by law, and to borrow, upon the credit of the county, a sum sufficient for the erection of county buildings, or to meet the current expenses of the county in case of a deficit in the county revenue." (Gen. Stat., p. 256, § 16.)

In these two provisions is contained ample authority to *build* county buildings, and to provide a means of paying for them, were it not for limitations contained in other sections. The next two sections are as follows:

"SEC. 17. The board of county commissioners shall not borrow money for the purposes specified in the fourth subdivision of the preceding section, without first having sub-

mitted the question of such loan to a vote of the electors of the county.

"SEC. 18. No board of county commissioners shall proceed to build any permanent county buildings, and assess any tax for that purpose, without first submitting the question to a vote of the electors of the county at some general or special election, and said election shall be governed by, and the returns thereof made in accordance with, the laws governing the election of county officers. The ballots used at said election shall be written or printed—'For the erection of public buildings,' 'Against the erection of public buildings.'" (Gen. Stat. 257.)

In these are contained limitations and restrictions on the grant of power in the third and fourth subdivisions of the preceding section. It will be observed that the general idea running through and permeating the grant of power, and the limitations of the same, is that of providing the means of creating a fund for the payment of any obligations incurred in the erection of permanent public buildings, and also that such obligations shall not be incurred as will render necessary the creation of a fund for the payment of the same, without the consent of a majority of the electors as expressed at a general or special election. In other words, the right to incur obligations for the erection of permanent county buildings, includes the right to use the means necessary to create a fund to pay the same, and if the necessary prerequisites prescribed by the statutes have not been observed or complied with, in order to give the right to create a fund with which to pay such obligations, then the right to incur such obligations does not exist. The two rights are correlative. They go hand in hand.

It was claimed in the court below, and may be claimed here, that the commissioners may have a fund on hand with which to build these buildings without having to borrow money on the credit of the county, or to levy a present tax for that purpose. To this we answer, that we do not anticipate—we do not jump over a stile till we get to it; and that if the commissioners have a fund arising from gift or bequest for that purpose, we will withdraw all objection. Further,

as a general rule the commissioners can have no money that does not arise from taxation, directly or indirectly. All the funds under the control of the commissioners arise directly by present, immediate taxation, or are borrowed upon the credit of the county, by bond or otherwise, whereby a debt is created; and resort must be had to taxation to pay interest and to create a sinking fund for the ultimate payment of such debt.

It is plain, then, that the commissioners, in the case at bar, have no right to incur the obligations threatened, unless the prerequisites have been complied with necessary to a legal exercise of the power to create a fund with which to pay the same. That the prerequisites have been complied with, the evidence entirely negatives.

It was claimed below, and so held by the learned judge who denied the application for an injunction herein, that the limitation contained in § 18, "No board of county commissioners shall proceed to build any permanent county buildings, and assess any tax for that purpose, without first submitting the question to a vote," etc., refers only to the latter clause, the assessment of a tax for that purpose, and is no limitation or restriction on the power of the commissioners to build permanent county buildings. If this be the true construction, the law-making power was exceedingly unfortunate in its use of language; and besides, the latter part of the section, which provides for the form of the ballot to be used on the submission, utterly negatives such a construction. The ballot to be used is, "For the erection of public buildings," "Against the erection of public buildings," not, "For the assessment of a tax," "Against the assessment of a tax." The question to be submitted to a vote under that section, according to its plain terms is, Shall public buildings be built? not, Shall a tax be levied? Any other construction seems to us absurd and ridiculous.

It is proved by the plaintiff, and tacitly conceded by the defendants, that the work called for by the plans and specifications is for a new building; that no money has been borrowed

on the credit of the county, or otherwise, to pay for such work; that the question of borrowing money for such purpose has never been submitted to a vote of the electors of the county; that the question of erecting permanent public buildings, or doing any work as shown by said plans and specifications, or assessing any tax for the payment of such work, or any of it, has never been submitted to a vote of the electors of the county. This being so, and keeping in view the limitations and restrictions contained in §§ 17 and 18 before quoted, can there be a shadow of doubt that the injunction ought to have been granted?

It cropped out in the argument in this case below, and was considered by the judge and passed upon in his opinion, and fully appears in another case now in this court between the same plaintiff and the same defendants, with the contractor and county treasurer added, that the county had about six thousand dollars to the credit of the county current-expense fund, and with that, so far as it would go, together with other money to be hereafter collected as taxes on account of such fund, the county commissioners would pay for the proposed improvements. The question then arises, Can this be legally done?

Our constitution contains the following provision:

" No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same; to which object only such tax shall be applied." (Art. 11, § 4.)

This is explicit, and is a bar to the diversion of any money that may be in the treasury to the credit of the current-expense fund. Independent of the constitutional provision, if such a proceeding were permitted it would enable the commissioners to do indirectly what they could not do directly; e. g., they might levy a tax for a purpose authorized by law and then appropriate the money to the erection of county buildings, and thus evade the statutory provision requiring the question to be submitted to a vote of the electors before a tax can be levied for the erection of county buildings.

If the erection of county buildings is a matter of current

expense, then the use of the money can be justified, otherwise not. Undoubtedly, the erection of public buildings is a county charge in the sense that the county, under proper conditions, must pay for the cost of them, but that it is a county charge in the sense used in section 1 of the act of March 5, 1862, we deny. (Gen. Stat. 295.)

In that section the legislature is undoubtedly considering the charges and expenses that are incidental in conducting the business of the county for the current year, and not such as are extraordinary in their character, and the benefits from which are permanent and continuous. Any other construction would nullify the restrictions and limitations contained in §§ 17 and 18 of ch. 25 of General Statutes.

In what we have said, we have assumed and treated the proposed improvements as being in fact the erection of a new permanent public building for the county, and not in any sense the repairing of an old one. In the plans and specifications no mention is made of any old building, but they refer exclusively to a new one to be erected; the proceedings of the county board so treat the work; the sworn petition of the plaintiff, used as an affidavit on the hearing, so alleges; and this is tacitly conceded by the defendants in their showing before the judge below, and the judge who heard and denied the application, so treated it. Besides, to expend seven thousand five hundred dollars now, under the guise of repairs, on a building which, ten years ago, in flush times, cost the county about three thousand dollars, and is now probably not worth more than half that, brings to mind Dundreary's stupid joke about the tail wagging the dog.

*L. F. Keller*, *John V. Sanders*, and *Frank Doster*, for defendants in error:

Plaintiff's counsel admit that, unless there are some other restrictions and limitations than those contained in § 16 of ch. 25 of Gen. Stat., the action of the board is legal. They refer the court to §§ 17 and 18 following, as containing the only restrictions on the power of the board to erect these

buildings. Let us examine these sections, and ascertain if it be not possible that the learned counsel for plaintiff have misconceived the point involved in this case.

The county board is not charged with borrowing money with which to build county buildings, or to meet the current expenses of the county, and we frankly admit that it could not borrow money for either of these purposes without submitting the question to a vote. And we further submit, that the county board could not legally borrow money for either of such purposes, or submit the question to a vote of the electors of the county, unless there was a deficit in the county revenue. But, say the learned counsel for the plaintiff, this borrowing money is one of the special methods provided by the legislature, whereby you may exercise the general power to erect public buildings. True, it is one of the methods whereby funds may be provided for this purpose, but it is such an *especial* and *extraordinary* way of providing funds for such purpose, that it is not to be resorted to except upon extraordinary occasions. Borrowing money and issuing bonds upon the credit of the county is not the ordinary and usual method of raising funds for the erection of county buildings, or for other county purposes.

Does any one suppose that, unless there were a special provision of law authorizing a county to borrow money for such purposes, it could lawfully do it? Certainly not. Then the legislature must have had some reason for authorizing a county to borrow money or to assess a special tax, as in §18, to erect county buildings; and the reason was this: In many new counties in Kansas there is now, and was when the law was enacted, but a small amount of taxable property, the greater portion of the real property being public lands or homesteads, not taxable, and the one per cent. permitted for general purposes would in many counties fail to afford a sufficient revenue to run the county from one year to another; and again, in others it would produce sufficient funds to pay the usual county expenses of such counties — yet it would not afford any surplus with which to provide suitable county

buildings. Therefore, these provisions were made for the purpose of allowing these counties the inestimable privilege of borrowing money either to run the county from year to year with, or for the erection of needed county buildings; and this unusual and extraordinary method of raising money for these purposes it was thought best to submit to the people, so that they might not be burdened with debt or unusual and exorbitant levies of taxes without their consent. Reading this §17 in connection with the 4th subdivision of §16 to which it refers, it is apparent that the former does not, and was not intended to restrict the power already conferred upon the board to erect county buildings, but only refers the question of providing the necessary funds for that purpose, by a loan, to the electors of the county, in the event of a deficit in the county revenue. Hence there is no restriction or limitation of the power to build contained in said §17.

Examining §18 in the light of the usual statutory construction, does *it* contain any limitation of, or impose any restriction upon, the general power to build, which the counsel for the state concede is conferred by §16? Said section reads as follows: "No board of county commissioners shall proceed to build any permanent county building, *and* assess any tax for that purpose, without first submitting the question to a vote of the electors of the county." We invite the attention of the court particularly to the fact that the two acts mentioned which are to be done by the board, viz., erecting buildings *and* assessing a tax, are joined by the copulative conjunction "and," making the two one combined whole, instead of being connected with the disjunctive conjunction "or," which would refer to either action contemplated, separate from the other. If the section read, "No board shall proceed to erect, etc., *or* assess a tax," etc., then, according to the ordinary use of language and general rule of statutory construction, the board could not proceed to erect the buildings without a vote, nor could it assess a tax without a vote, nor could it do both together; but when the two are joined

by the conjunction "and," the board is not forbidden to do either *alone*, but from doing *both together* as one act; *i. e.*, the board cannot proceed to erect county buildings *and* assess any tax for that special purpose, without submitting the question as a whole to the electors.

It seems clear that the central idea contained in said § 18 is to limit the assessing of a special tax upon the people to pay for the county buildings mentioned in the 3d and 4th subdivisions of § 16, and not a limitation upon the power to build. What was the danger against which the Legislature designed to guard the tax-payers and electors of the county when it enacted said §§ 17 and 18? Was it the erection of proper and necessary county buildings at the county seat, such as the immediate necessities of the county demanded, or was it the incurring of a debt by a loan to pay for such buildings, or the assessing of a heavy tax upon the people to accomplish the same? Which is the more rational and sensible view to take of this question, independent of all technical rules of construction and technical statutory expressions, that the erection of county buildings required by law and the ordinary business of the county, at the seat of justice of the county, was the central idea, the one preëminent in the mind of the legislator when he voted upon the passage of this law, to guard and hedge in the people of the county from the terrible and disastrous consequences to flow from the unrestricted exercise of the power to build county buildings, or was it the danger and disaster that would probably flow from the unlimited and unrestricted grant of power to "borrow money" and incur a debt unlimited in amount upon the tax-payers of the county or the "assessment of a tax," also without limit, that induced the legislator to hedge in the tax-payer by said enactments from the evils and burdens to flow from a too-free exercise of this power to borrow money or assess a tax? Common sense and reason answer that it was to prevent the incurring of a burden of debt or the assessment of an exorbitant tax upon the people without their full and free consent thereto. No evil can result to the people from the erection

of necessary and suitable county buildings at the place designated for the seat of justice, unless by so doing a burden of debt will be incurred or a tax will be levied upon the people greater than they can bear.   Certainly if some one or more citizens of the county should see fit to donate to the county a sum sufficient to erect all the county buildings which the county would need for a hundred years, and the board should immediately proceed to erect such buildings at the county seat that had been located by a vote of the people of the county, and pay for the same out of the fund so donated, neither the district court nor this court on error would say that an injunction ought to be granted to restrain the construction of such buildings because the question of building had not been submitted to the electors under §18.   Then as the county board is not borrowing any money and running the county in debt, nor assessing any tax to build the buildings complained of (because it must be apparent to the court by this time that it is the buildings the plaintiff complains of, and not any evil that has befallen or likely to befall the electors and tax-payers of the county by their erection), nor threatening to borrow any money or assess any tax for this purpose, the defendants are not coming within any statutory restriction or prohibition contained in said §§17 and 18. Then, as counsel for the state say, if we could have built the buildings complained of, and paid for them out of the fund on hand for county charges, if said §18 had never been passed, we can still do so, for that section nowhere prohibits us from so doing.   And this, we think, disposes of all supposed statutory limitations and restrictions upon the power to build granted by §§3 and 4 of art. 1, ch. 25, and §16 of art. 2, same chapter.

But counsel for plaintiff, seemingly conscious of the untenable position taken by them upon this question, in their desperation fly for safety to that great bulwark of our liberties, the constitution, as though it would prove a city of refuge for them.   But, strong and invulnerable as that fortification usually is for all who have a right to seek its protection,

in this case they have come far short of entering within
the pearly gates thereof.   The particular provision of this
instrument which they would have us believe affords them a
remedy for all their grievances (?) is § 4 of art. 11, reading
as follows:  "No tax shall be levied except in pursuance of
a law which shall distinctly state the object of the same, to
which object only shall such tax be applied;" and learned
counsel have the hardihood to assert that this provision pro-
hibits the county board from paying for necessary county
buildings out of the fund which, they denominate a fund to
defray "current expenses and county charges," but which,
of course, means "county revenue," as mentioned in sub-
division 4 of § 16, ch. 25, Gen. Stat.   Now if paying for
county buildings is not liquidating a county charge or ex-
pense, then there may be some force in the argument.   And
we say with the learned judge, that said provision has no
weight in the examination of this case, and hence needs no
construction here by this court.

   Let us see if this is not so.   If it is to be construed as a
law affecting the proposed action of the county board herein
complained of, what kind of construction must be given to it?
Does it mean that the legislature must expressly, specifically
and in minute detail enumerate all the purposes to which
every tax levied by the various boards of assessors in school
districts, townships, cities and counties, shall be applied?
Must the law authorizing the levy of a tax for current ex-
penses and county charges, specify that so much shall be
levied for fuel, so much for jurors' fees, so much for county
printing, so much for salary of each county officer, so much
for rent when county buildings have to be rented, so much
for insurance of county buildings, so much for repairs, so
much for boarding of prisoners, so much for the purchase of
sites for county buildings, and so much for making additions
to county buildings, and so on to the end of all necessary
county expenses; or may the legislature sum up the whole,
as it has attempted to do in Gen. Stat., p. 295, § 1?

   Now, if the theory of the plaintiff's counsel be the true

one, that this constitutional provision prohibits the levying of a tax for any purpose, unless the law authorizing the same *distinctly* states the object of the tax, the construction which the attorney general puts upon this section of the constitution would make the section of the statute last above referred to, unconstitutional. And if his theory be the true one, then what tax· has ever been legally levied or collected in this state? Said statute defines nothing for which taxes shall be levied save "county charges" and "expenses," and this court must either pronounce it in conflict with said constitutional provision, and say no tax has ever been legally levied under it, or say that in the absence of any legislative restriction, the board can do just what said statute authorizes it to do, to wit, levy a tax to cover all county charges and expenses. And this brings us back again to the inquiry, What are "county charges" and "expenses?" We submit that county charges and expenses mean such expenses as are necessarily incurred by carrying on the business of the county in the best manner possible for the county's·interest; and what is the best manner, the board in the absence of statutory restrictions must in the exercise of a sound discretion be the judge.

The opinion of the court was delivered by

HORTON, C. J.: Before proceeding to the principal inquiry involved in this action, we will dispose of the preliminary objections presented on the part of the defendants to our consideration of the merits of the cause. These are: *First,* that the state is not the party in interest, and hence, that the suit cannot be maintained in its name; and, *second,* if the suit can be maintained in the name of the state, it cannot be done on the relation of the county attorney. Neither of these objections is tenable. The suit is being prosecuted by the proper officer, and in the name of the proper party plaintiff; and in justification of this conclusion we need only refer to the prior decisions of this court: *Craft v. Comm'rs of Jackson*

Co., 5 Kas. 518; *Bobbett v. State*, 10 Kas. 9; *Bartlett v. State*, 13 Kas. 99; *State v. Faulkner*, 20 Kas. 541.

The main question at issue is, whether a board of county commissioners have the power to use or appropriate the fund raised by taxation to defray county charges and expenses for the construction of permanent county buildings? Counsel for defendants contend that under the express authority given by §§ 4 and 16, ch. 25, Gen. Stat., the county commissioners of Marion county had ample power to make the order of the 9th of August, 1878, and build the county building therein referred to, and also to furnish the means of paying for it from the revenue levied to defray the county charges and expenses, and further contend, that the only restrictions or limitations upon this power are the conditions in §§ 17 and 18 of said chapter 25, which they assert merely prohibit the commissioners from borrowing money or assessing special taxes for permanent buildings without first having submitted the question to a vote of the electors of the county.

On the other hand, it is claimed on the part of the counsel for the plaintiff, that the commissioners have no right to expend the yearly levies intended for county charges and expenses to build permanent county buildings, and that the right to incur obligations for the erection of this class of buildings includes the right to use the means necessary to create a fund to pay the same, and if the necessary prerequisites prescribed by the statute, to wit, the obtainment of the consent of the electors expressed through the ballot-box, have not been fully complied with, in order to give the right to create a fund with which to pay such obligations, then the right to incur such obligations does not exist.

This latter view seems to us the better construction of the various provisions of the statute upon the subject, and more in consonance with the letter and spirit of the law. The revenue collected from the levy provided for in section 1, Gen. Stat. 295, was evidently intended to be used only for ordinary and current expenses.

The words "county charges and expenses," employed in

28 — 21 KAS.

said section 1, are synonymous with the phrase "current expenses" in §§ 16 and 181, ch. 25, Gen. Stat. These phrases only include such charges and expenses as are incidental in conducting the business of the county government for the current year. It would be a strained construction of language to say that the erection of permanent county buildings, costing thousands of dollars, is the ordinary current expense of a county. It is in fact an extraordinary and exceptional expense. When permanent county buildings are once erected and completed, the benefits to the county are permanent and continuous; and while the erection of such buildings is a county charge and expense in the sense that the county, under proper conditions, must pay the cost of them, it is not a county charge in the meaning of said section 1 of Gen. Stat. 295, nor a part of the "current expenses" referred to in the fourth subdivision of sec. 16, and in sec. 181, ch. 25, Gen. Stat. That the legislature did not understand that "current expenses" included the "erection of county buildings," is manifest from the language of the said fourth subdivision of sec. 16, which reads as follows: Apportion and order the levying of taxes as provided by law, and to borrow, upon the credit of the county, a sum sufficient for the "*erection of county buildings*," or to meet the "*current expenses*" of the county when there is a deficit in the county revenue. In this subdivision, *county buildings* and *current expenses* are placed in an antithetical relation to each other, and, as used, express different purposes for which money may be borrowed. If the funds needed to defray the current expenses could be applied to the erection of county buildings, then the law-makers were guilty in adopting said subdivision four of repeating therein the same meaning in different words. Such is not the true construction, nor even a reasonable one. In addition, it is not necessary to give a forced and extended definition to county charges and expenses in order to furnish commissioners with funds to build county buildings, as it appears that other and ample provisions have been made by the legislature for the creation of a fund, distinct from the general

revenue of a county, out of which to erect these buildings. This power is found in the authority to borrow money, or assess special taxes therefor, under the condition that a majority of the electors of the county first sanction the creation of a fund to construct such buildings. (§§ 16, 17, 18, 19 and 20, ch. 25, Gen. Stat.) As it was not designed or intended to include in the levy for county charges and expenses the means to erect county buildings, and as the constitution of the state prohibits the diversion of taxes from the object for which they are levied, it seems to us that the commissioners of Marion county have no power to employ the current-expense fund of the county for the building proposed to be constructed under their order of last August. All proceedings by them in that direction, without a direct vote of the electors of their county, are an exercise, or an attempt to exercise, power on their part unauthorized by law. Such illegal and unauthorized acts of officers, tending to aggrieve the whole community alike, are the proper subjects of the preventive jurisdiction of equity, when its exercise is invoked by suitable authority. The conclusion we have reached leads necessarily to the other inference, viz.: that before county buildings are constructed at the charge of the county, the sanction of the electors of the county must be first obtained. No funds can be secured by borrowing for this purpose without a vote; nor can any special tax be levied for like object without an appeal to the ballot.

With occasional exceptions, county buildings are constructed at the expense of the tax-payers, and as this class of buildings is often costly and usually intended to be permanent, the legislature, in its wisdom, has restricted the power of the county commissioners over their erection, and deposited with the electors the decision whether improvements of this character shall be made. If the current-expense fund can be drawn upon for this purpose, the restrictions would be nugatory, as each year taxes could be assessed in violation of said section 18 to build permanent county buildings, under the name of "county charges and expenses." It

is a well-settled rule, that the law does not permit that to be done indirectly which may not be done directly. That the present county buildings are insufficient, and many of the public offices unsafe; that there is no jail or jury room in the county; that it is inconvenient for the commissioners to rent rooms for county purposes; and, finally, that the proposed buildings are greatly needed in Marion county, are no arguments in favor of the commissioners' proceeding to make any contract therefor, without first submitting the question to a vote. The officers of the county are the mere agents and servants of the people, and if new buildings are needed and demanded by the electors, the board has been derelict in not obtaining from such electors the authority to erect such buildings in the manner provided by the statute.

A further argument against the right of the commissioners to erect permanent county buildings, without a vote, is found in ch. 26, Gen. Stat. 296. Section 2 of this chapter provides that —

" When the county seat of any county has been located by a vote of the electors of the county, or when county buildings have been erected, donated or purchased at the county seat at a cost of at least two thousand dollars, the board of county commissioners upon the petition of *three-fifths* of the legal electors of the county, or where county buildings have been erected at the county seat at a cost to the county of ten thousand dollars, the board of county commissioners upon the petition of *three-fourths* of the legal electors of the county shall order an election for the re-location of such county seat."

The erection of the new permanent buildings will cost nearly $7,500. The building now in use cost about $3,000. If the county commissioners are permitted to proceed with the construction of the building, the county will have paid out over $10,000 for its public buildings. Such action will result in directly aiding the continuance of the county seat at Marion Centre, as then no election can be had for the re-location of the county seat unless *three-fourths* of the electors petition therefor. If this building is not erected, a vote for a change of the county seat can be had if *three-fifths* of the

electors sign a petition. Thus, the difficulty of a vote on a change of the county seat is increased. As the question of the location of county seats was intended to be within the control of the electors of a county, with certain restrictions on calling elections, it is not strange that the legislature purposely provided that the commissioners could not add to the restrictions by the expenditure of public funds at their own pleasure. The electors are the parties most interested. They must be consulted and their assent given in a legal way, if permanent county buildings are erected.

The application of the plaintiff for an injunction to restrain the defendants from letting a contract to erect county buildings should have been allowed.

The order of the district judge will therefore be reversed, and the case remanded with directions to said judge to grant the injunction.

All the Justices concurring.

