[Civ. No. 1149. Third Appellate District.—June 7, 1913.]

W. F. McCLURE, as State Engineer etc., Petitioner, v. A. B. NYE, as State Controller, Respondent.

[Civ. No. 1150. Third Appellate District.—June 7, 1913.]

COMMISSION FOR THE FIFTIETH ANNIVERSARY OF THE BATTLE OF GETTYSBURG, etc., Petitioner, v. A. B. NYE, as State Controller, Respondent.

CONSTITUTIONAL LAW—APPROPRIATIONS BY LEGISLATURE—TIME OF TAKING EFFECT.—Appropriations for the erection of buildings, the construction of other improvements for state institutions, and the payment of the transportation of Civil War veterans to and from the Gettysburg reunion are not for "the usual current expenses of the state," within section 1 of article IV of the constitution, which permits acts making appropriations for such expenses to go into effect immediately.

ID.—CURRENT EXPENSES—DECLARATION OF WHAT ARE BY LEGISLATURE.—The declaration of the legislature that such appropriations are for the usual current expenses of the state does not bind the judiciary.

ID.—DEFINITION OF CURRENT EXPENSES.—The usual current expenses are the common, ordinary, regular and necessary expenses of the various departments of the state government.

ID.—GIFTS BY LEGISLATURE FOR GETTYSBURG REUNION.—An appropriation by the legislature for the transportation of Civil War veterans to and from the Gettysburg reunion is in contravention of section 31 of article IV of the constitution, forbidding gifts of public funds by the legislature.

ID.—INITIATIVE AND REFERENDUM—CONSTRUCTION OF CONSTITUTION.—A constitutional provision for the exercise of the initiative and referendum should be construed so as to make effective this reservation of power on the part of the people.

APPLICATION for Writ of Mandate directed to State Controller to draw his warrant in favor of petitioners.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, for Petitioners.

Robert A. Warring, and E. J. Hughes, for Respondent.

BURNETT, J.—We have before us two separate applica
tions for writ of mandate to require the state controller to
draw and issue his warrant upon the state treasurer in favor
of petitioners for several claims presented in pursuance of
certain acts of the legislature.   These legislative acts are set
forth in the petitions and the two cases were heard together
and will be considered in one opinion.   A general demurrer
was filed to each petition and, as the matter is thus presented,
only one question needs to be discussed as that is decisive of
the whole controversy.   That question is whether, under the
constitutional provision hereafter to be noticed, any of these
claims must or can be paid or a warrant drawn therefor at
any time prior to ninety days after the adjournment of the
legislature.   That provision is found in section 1 of article
IV, adopted by the people October 10, 1911, and reads as
follows: "No act passed by the legislature shall go into effect
until ninety days after the final adjournment of the session
of the legislature which passed such act, except acts calling
elections, acts providing for tax levies or appropriations for
the usual current expenses of the state, and urgency measures
necessary for the immediate preservation of the public peace,
health, or safety, passed by a two-thirds vote of all the mem-
bers elected to each house.   Whenever it is deemed necessary
for the immediate preservation of the public peace, health or
safety that a law shall go into immediate effect, a statement
of the facts constituting such necessity shall be set forth in
one section of the act, which section shall be passed only
upon a yea and nay vote, upon a separate roll-call thereon."

. It appears, without controversy, that none of the legisla-
tive acts herein involved can be construed or considered as
within the purview of any of said exceptions, unless possibly
of that providing for "appropriations for the usual current
expenses of the state."

Eliminating, therefore, the other classes of legislation and
stating further, preliminarily, that it has been much less than
ninety days since the legislature passing said acts adjourned,
we address ourselves to the question whether, in any just
view of the law, we can direct the controller to draw his
warrant for any of these claims on the ground that it is for
the "usual current expenses of the state."   The said acts of
the legislature, respectively, appropriate various sums for

the purposes therein enumerated, as follows: 1. "The sum of $12,000.00, or so much thereof as may be necessary, is hereby appropriated out of any money in the state treasury not otherwise appropriated, to be used in accordance with the law for the completion of a dam and reservoir at Mendocino state hospital." 2. "The sum of $10,000.00, . . . for the construction of temporary buildings at Fresno state normal school." 3. "The sum of $23,000.00, . . . for building and furnishing cottages and dormitories at Preston school of industry." 4. "The sum of $5,700.00, . . . to provide for the construction of a power house, power plant, equipment, tank, tank pipe-line and improvements in drainage, water, heating, and electrical systems on the premises of the state normal school at Chico, California." 5. "The sum of $5,000, . . . to be used in accordance with the law for the development and extension of the water system at the California polytechnic school." 6. The sum of $15,000 is appropriated for the purpose of paying the transportation of certain veterans of the civil war to Gettysburg, Pennsylvania, on the occasion of the fiftieth anniversary of the gigantic contest of that memorable battlefield. This act, it may be said, provides for the appointment by the governor of a commission of three persons who are directed to obtain the names and addresses of all veterans now residing in this state who took part in that battle and these commissioners are charged with the duty of making the proper and necessary arrangements for said transportation.

To each of these acts is appended this statement: "This bill, inasmuch as it provides for the usual and current expenses of the state, shall, under the provisions of section 1 of article IV of the constitution of the state of California, take effect immediately."

Notwithstanding the legislative declaration to the contrary, we think it entirely clear that not one of said appropriations is for the "usual current expenses of the state." The *usual current* expenses are the common, ordinary, regular, and necessary expenses of the various departments of the state government. It is plain that they do not include the unusual, the extraordinary, the uncommon or the exceptional. "Usual" is defined by Webster as "such as occurs in ordinary practice or in the ordinary course of events;

customary; ordinary, habitual; common." According to the same authority, "current" means "now passing as time; as the current month; common, as current history." "Running" is also a familiar and more strictly the etymological definition of "current."

In 12 Cyc., 998, "current expense" is defined as "ordinary expense; expense incurred within a reasonable time." While varying forms of expression may be used, therefore, it is fair to say that by said exception the people intended to provide that the regular or ordinary running expenses of the state government should be taken out of the operation of the general rule. That their intention was thus to confine this exception within limits no more extensive is manifest by a consideration of the context and the general purpose to be reached and accomplished by said constitutional enactment.

This amendment to the constitution provides a scheme for the exercise of what is known as the initiative and referendum and, of course, if possible, the language should be construed so as to make effective this reservation of power on the part of the people. It was clearly their purpose, except where the exigency of the public service demanded otherwise, that no legislative enactment should become operative until an opportunity were afforded the people to express their judgment as to the merits of the measure. The time within which a petition may be presented in contemplation of this action by the people is limited to ninety days after the adjournment of the legislature, and hence the manifest propriety of suspending for said period the operation of any measure that should be thus reviewed.

The exceptions provided are ample enough to prevent any menace to the public welfare by reason of such delay incidental to a submission to popular vote, and they should not be given an interpretation so elastic as virtually to circumvent and nullify the will of the people so solemnly expressed in said constitutional provision.

Nor is this a case where we are bound by the legislative declaration that these appropriations are for "the usual and current expenses of the state." If it appeared that this determination of the legislature might be a lawful and rational conclusion from facts submitted for the consideration of the legislators, then we would be bound to draw the

same inference.  But we are not dealing with a question involving a possible conflict of evidence or one permitting a different rational solution.  The facts appear upon the face of the enactment and the only reasonable conclusion is that such an appropriation is not for the "usual current expenses of the state."  The said legislative declaration has no greater effect and is no more binding upon the court than if the legislature had declared that a certain measure is or is not constitutional.  In such contingency that question would still remain for the courts to determine.  The question before us is simply one of construction or interpretation of an act of the legislature and of a provision of the constitution, and that is a judicial question.

While no case entirely parallel to this has been called to our attention, the following decisions are somewhat suggestive and instructive:

In an opinion of the judges of the supreme court of South Dakota, reported in *Re Limitation of Taxes,* 3 S. D. 456, [54 N. W. 417], the question was considered whether the legislature had the constitutional power to provide and impose, under any circumstances, a tax of two mills on each one hundred dollars of assessed valuation.  The constitution provided that "The legislature shall provide for an annual tax sufficient to defray the estimated *ordinary expenses* of the state for each year, not to exceed in any year two mills on each one hundred dollars of assessed valuation."  It was declared that "the *ordinary expenses* of the state are practically defined in section 2, article XII of the constitution and 'are the ordinary expenses of the executive, legislative and judicial departments of the state, the current expenses of state institutions, interest on the public debt and for common schools.' "  It is further stated that the *ordinary current expenses* can be estimated each year with close approximation to correctness.  Therefore the constitution had provided against excessive taxation for those purposes by establishing a fixed maximum rate.  No such arbitrary limit was feasible, so it was held, for extraordinary and emergency cases, among which the court enumerates instances where expense might be incurred "to protect the people of the state by extreme and unusual means against an approaching pestilence, or to make temporary provision for the patients of the insane hospital, un-

housed and scattered by a devastating fire, or for any other exceptional and extraordinary object essential to the welfare of the state. Such expenses would be, confessedly, extraordinary and unusual.''

While no attempt is made in said opinion to enumerate fully the ordinary current expenses of the state, the view does appear therein that they are limited to those that are usual, necessary and, as far as practicable, fixed and definite in their character. The opinion does not harmonize with the position that expenses incurred for new buildings, for the completion of a dam and reservoir, for the construction and equipment of a power house and power plant and for the development and extension of a water system and for the transportation of the citizens of the state to and from another state are any part of the ''usual and current expenses of the state.''

In *State* v. *Commissioners of Marion County*, 21 Kan. 419, the court had before it an application for an injunction to restrain the board of county commissioners from letting a contract to erect county buildings and in the course of the opinion it was said: ''The words, 'county charges and expenses' employed in said section 1, are synonymous with the phrase 'current expenses' in secs. 16 and 181, Ch. 25, Gen. Stat. These phrases only include such charges and expenses as are incidental in conducting the business of the county government for the current year. It would be a strained construction of language to say that the erection of permanent county buildings, costing thousands of dollars, is the ordinary current expense of a county. It is in fact an extraordinary and exceptional expense. When permanent county buildings are once erected and completed, the benefits to the county are permanent and continuous; and while the erection of such buildings is a county charge and expense in the sense that the county under proper conditions must pay the cost of them, it is not a county charge in the meaning of said section 1 of Gen. Stat. 295, nor a part of the 'current expense' referred to in the fourth subdivision of section 16 and in section 181, Ch. 25, Gen. Stat.''

In *Sheldon* v. *Purdy*, 17 Wash. 140, [49 Pac. 230], it is said: ''The building of new school houses and the purchase of school house sites do not come within any authorized sig-

nification of 'current expenses.' Neither do they come within any well-defined acceptation of 'support of the common schools.' Both the terms, 'support' and 'current expenses' when applied to the common schools of this state, mean continuing regular expenditures for the maintenance of the schools. Building a new school house and purchasing a site, while at times necessary and proper, are unusual and extraordinary expenditures.''

In *Stanton* v. *Board of Education,* 68 N. J. L. 496, [53 Atl. 236], it was held that the phrases, ''current expenses'' and ''running expenses'' are identical in signification.

In *Mills* v. *Township of Richland,* 72 Mich. 100, [40 N. W. 183], it was held that the ''ordinary expenses'' of a township do not include those incurred in establishing lost section corners or, ''in building a town-hall, for the public gathering of the citizens, whether *in whole or in part* for the use of the town.''

In *Mayor etc. of Rome* v. *McWilliams,* 67 Ga. 106, it was held that, under the statutory classification provided by the legislature of that state, ''the erection of a town-hall, with its conveniences for the city government, engine houses, etc., belong to, and are to be regarded as a part of the 'ordinary current expenses of the city,' '' but it was further declared that ''It has heretofore been usually understood that 'ordinary current expenses' mean those *annual* expenses attending the administration of the city government that are expended and consumed in payment of salaries and those temporary expenditures in the way of repairs, etc., that appertain to the city, its streets, bridges, culverts, etc.'' It seems, however, that the legislative authority had specified what constituted extraordinary expenses and had provided that all other ''expenses and disbursements of the city of every kind'' should be considered as ordinary current expenses.

It may be suggested that one or two of the appropriations herein considered approach more nearly than the others to what is understood to be required by the said constitutional provision. With some plausibility it might be argued that a distinction in this respect exists between an appropriation to complete a structure or enterprise already begun and an instance where the expressed purpose is to initiate and, may be,

to complete a public improvement. A case might arise where the distinction would be important and persuasive, but we do not think the condition here could be affected by any such consideration.

It is likewise probably true that some of these appropriations might have been made immediately available as emergency measures but, as already seen, we are precluded from entering upon any inquiry of that kind, since no attempt was made to comply with the constitutional requirement as to emergency measures, hereinbefore set forth.

It may be said, also, that the appropriation for the transportation of veterans to Gettysburg and return is clearly in contravention of section 31 of article IV of the constitution, providing that "the legislature shall have no power . . . to make any gift, or authorize the making of any gift, of any public money or thing of value, to any individual, municipal or other corporation whatever." No refinement can make it appear otherwise than as a gift, and therefore under the ban of the constitution.

As a matter of sentiment it is, of course, to be regretted that this appropriation cannot be made. No doubt our citizens generally would rejoice to know that this aid had been extended to these venerable men who, in the language of Webster, "have come down to us from a former generation" and who deserve so well of their countrymen.

We are heartily in accord with the spirit that would lead to the gratification of their natural and commendable desire to revisit the scene of their heroic conflict and to stand again shoulder to shoulder with their true comrades of the days "that are past and gone," but we have neither the right nor the inclination to ignore or override the law, even for so worthy a purpose.

We think the controller is clearly right in his contention, and the demurrer to each petition is sustained and the writ denied.

Chipman, P. J., and Hart, J., concurred.