WILLIAM JOHNSON v. THE BOARD OF COMMISSIONERS OF WILSON COUNTY, *et al.*

1. TEMPORARY INJUNCTION *to Restrain Issue of County Bonds.* Where an action is commenced under the provisions of art. 7, ch. 36, Comp. Laws of 1879, to contest the validity of an election held in a county to vote upon the proposition to issue the bonds of the county for the purpose of erecting permanent county buildings at the county seat, and also to enjoin the county commissioners from issuing or negotiating any bonds, the plaintiff is not entitled upon filing his verified petition, as a matter of right, to have a temporary injunction granted restraining the issuing of the bonds until the contest can be tried and determined.

2. INJUNCTION — *When Granted, When Not.* In such a case, if the court or judge to whom the application is made for the temporary injunction is satisfied that there is a *bona fide* controversy over the question whether the proposition to issue the bonds has been carried, and sufficient votes cast in favor of the proposition are seriously challenged to change the result, and upon the hearing of the application there is great conflict in the affidavits offered, it would be best for the court or judge as a general rule, to grant the temporary injunction, so that the real facts of the case may be ascertained on the final hearing upon oral or other competent evidence, as the truth of a petition cannot be satisfactorily determined upon conflicting affidavits merely; but the granting or refusing of the temporary injunction rests largely in the sound judicial discretion of the court or judge to whom the application is made.

3. COUNTY BOARD; *Power to Borrow Money.* Under the provisions of §§ 16 and 17, chapter 25, Comp. Laws of 1879, the board of county commissioners of a county has the power to borrow, upon the credit of a county, a sum sufficient for the erection of county buildings, but the commissioners cannot borrow the money for such purpose without first submitting

Statement of the Case.

the question of the loan to a vote of the electors of the county; and in such a case, it is not necessary that the commissioners should also submit the question of building permanent county buildings, as required by the provisions of § 18 of said chapter 25.

4. —————— *Submitting Proposition to Voters; Implication.* Where the board of county commissioners makes an order to submit to a vote of the electors of the county the question of issuing the bonds of the county in a sum not to exceed thirty thousand dollars, for the erection of permanent county buildings, and subsequently such proposition is submitted to a vote of the electors, such order and submission necessarily imply that the board has determined that thirty thousand dollars, or at least a sum not exceeding thirty thousand dollars, is necessary to be raised by loan for the purpose proposed; therefore, such order and submission are not invalid or void under the provisions of § 19 of said chapter 25, because not more expressly stating therein that the board has determined the sum necessary to be raised.

5. NOTICES — *Posting by Sheriff, When Sufficient.* The board of county commissioners may appoint the sheriff of its county to post up the written or printed handbills required by § 19 of said chapter 25, and if the sheriff performs this duty in good faith, not acting corruptly or partially, the posting will be sufficient, if made in five of the most public places in each township for the time required, although witnesses may differ *as to what are the most public places in the townships.*

*Error from Wilson District Court.*

ON July 9, 1885, the county commissioners of Wilson county made the following order, which was entered on their journal:

"It is ordered by the board of county commissioners of Wilson county, Kansas, that a special election be held at the usual places of voting in the several townships therein, on Saturday, the eighth day of August, 1885, for the purpose of voting upon the following proposition, to wit: Shall the board of county commissioners of Wilson county, Kansas, for and in behalf of said county, issue the bonds of said county in a sum not to exceed thirty thousand dollars, to bear interest at the rate of five per cent. per annum, payable semi-annually; said bonds to be in the sum of one thousand dollars each, two of said bonds payable in five years from the date thereof, and two of said bonds to be payable each year thereafter until the whole are paid, for the purpose of erecting permanent county buildings in the public square in the city of Fredonia, Wilson county, Kansas; at which said election those voting in favor

of said proposition shall have written or printed on their ballots the words 'For the loan,' and those voting against the proposition shall have written or printed on their ballots 'Against the loan'?

"And it is further ordered, that the sheriff of said Wilson county give due notice and make proclamation of the time and place of holding said election, as by law required."

On July 15, 1885, at a special session of the county board called for the purpose of changing the time of the election named in the foregoing order, the following order was made and entered upon the journal:

"The proposition to vote $30,000 of the bonds of Wilson county, Kansas, to build a court house and jail and for the purpose of altering the time already fixed for said vote for said proposition, viz., August 8th, 1885, came on regularly for consideration upon the application of those favoring the proposition; and upon consideration of the insufficiency of the time given for notice of said election as first ordered, it is by the board considered and ordered that a new date shall be fixed for said election. It is ordered that the order heretofore made for said election shall be annulled, and that said election shall be held September 7th, 1885, and the clerk and sheriff are hereby ordered to give due and legal notice of said election as required by law."

On September 7, 1885, the election was held. On September 11th, the county board met as a board of canvassers and canvassed the returns of the election, and ascertained that 1,435 electors had voted for the proposition, and 1,334 had voted against it; and thereupon declared the proposition carried. On September 14, 1885, the plaintiff, *William Johnson*, brought this action in the district court of that county, under the provisions of art. 7, ch. 36, Comp. Laws of 1879, for the purpose of contesting the election; to have the same adjudged void, and the defendants permanently enjoined from issuing or negotiating the bonds. He applied to the court for a temporary injunction to prevent any disposition of the bonds pending this action. A restraining order was granted, and the hearing of the application for a temporary injunction set for September 22, 1885, and he was required to give the defendants notice

thereof. On September 22, 1885, the plaintiff filed an amended petition, and on the same day served notice of the same upon the defendants. On said day the application for a temporary injunction came on to be heard.

The judge hearing the case filed the following opinion:

STILLWELL, J.: On September 7th, 1885, an election was held in Wilson county on the proposition of issuing the bonds of said county in the sum of thirty thousand dollars, for the purpose of erecting permanent county buildings in the city of Fredonia, in said county. On Sept. 11th, the county board met as a board of canvassers and canvassed the returns of said election, and from said canvass they ascertained and declared that 1,435 electors had voted for the proposition, and 1,334 had voted against it, and therefore they declared the proposition carried.

On the 14th day of September, 1885, the plaintiff, Johnson, brought this action, under the provisions of art. 7, ch. 36, Dass. C. L., for the purpose of contesting the validity of said election, to have the same adjudged null and void, and the defendants permanently enjoined from issuing or negotiating the aforesaid bonds. He applied to the court for a temporary injunction to prevent such disposition of the bonds pending the suit. A restraining order was granted, and the hearing of the application for the temporary injunction set for Sept. 22, and he was required to give the defendants notice thereof. A hearing has been had before the court for said temporary injunction; a large quantity of evidence has been introduced for and against the application, and the matter now to be decided is, whether said temporary injunction should be granted or denied.

The plaintiff assails the validity of the election of Sept. 7, on various grounds. They may be summarized as follows:

1. He claims that the county commissioners have no power to submit to the electors of the county the question of raising any money by loan to build permanent county buildings until they shall have first submitted to the electors of the county the distinct and independent proposition of the erection of permanent county buildings, and the electors have decided in favor thereof; that when that has been done, and not before, then the proposition of raising money for such purpose by loan can be submitted to the voters.

2. He further claims that even if an election could be held to borrow money for such purpose without first having a vote

43 — 34 KAS.

on the specified question of erecting county buildings, that even in such a case as regards the election in controversy, the board of commissioners of Wilson county never "determined the sum necessary to be raised," as specified by § 19, ch. 25, Dass. C. L., and that they never caused any "notice of such determination" as indicated by the aforesaid section, to be given the electors of the county prior to the election.

3. He also claims that no notice of said election as required by law was given in at least four townships in said county, to wit—Neodesha, Newark, Cedar, and Chetopa. (The notice that the law specifies for this class of elections is written or printed handbills, to be posted by the sheriff in five of the most public places in each township, for at least thirty days previous to the time fixed for the taking of the vote. Sec. 19, *supra.*)

4. The plaintiff further alleges that in the township of Center (in which the city of Fredonia is situated) divers illegal and fraudulent votes were cast and counted in favor of the proposition; that they were cast by minors, and in the names of fictitious persons, and by persons not present at said election, and by persons who were not qualified electors. A list comprising the names of 181 of such alleged illegal and fraudulent voters is attached to the petition and made part thereof.

These, as I understand it, are the main objections urged to the validity of said election. There are some minor objections, however, that will be noticed hereafter.

The first point for consideration is the one urged by the plaintiff, that the board had no power to submit the question of borrowing money by means of a loan, to erect permanent county buildings, without first submitting the question of the erection of the buildings to the voters of the county, and procuring their assent thereto. The provisions of the statute which relate to this matter, so far as I am advised, are contained in subdiv. 4 of § 16, and §§ 17, 18, 19, and 20, of ch. 25, Dassler's Compiled Laws of Kansas, which read as follows:

SEC. 16. The board of county commissioners of each county shall have power at any meeting, . . . *Fourth.* [To] apportion and order the levying of taxes as provided by law, and to borrow, upon the credit of the county, a sum sufficient for the erection of county buildings, or to meet the current expenses of the county, in case of a deficit in the county revenue.

SEC. 17. The board of county commissioners shall not borrow money for the purposes specified in the fourth subdivision of the preceding section, without first having submitted the question of such loan to a vote of the electors of the county.

SEC. 18. No board of county commissioners shall proceed to build any permanent county buildings, and assess any tax for that purpose, without

first submitting the question to a vote of the electors of the county at some general or special election, and said election shall be governed by, and the returns thereof made in accordance with, the laws governing the elections of county officers.  The ballots used at said election shall be written or printed—"For the erection of public buildings," "Against the erection of public buildings."

SEC. 19.  Whenever it shall become necessary, under the provisions of this act, to submit to a vote of the electors of any county the question of raising any sum of money by loan, the said board, after having determined the sum necessary to be raised, shall cause notice of such determination, and the time when the question will be submitted to the electors of such county, by written or printed handbills, posted up in five of the most public places in each township, for at least thirty days previous to the time fixed for the taking of such vote.

SEC. 20.  At the time specified in such notice, a vote of the electors of such county shall be taken in each of the townships of such county, at the place designated in the notice.  The inspectors receiving the votes shall be the same as required at the general election, and the votes shall be canvassed by the same the officers, and in same manner as required at such general election, and the result of such vote shall be certified by them, and· transmitted to the county clerk 'within ten days after such vote shall be taken, which certified statement shall be delivered by such clerk to the board of commissioners at their next meeting.  All voting in the several townships as provided by this section, shall be by ballot, and those voting in favor of such proposed loan shall have written or printed on their ballots, "For the loan;" and those voting against the loan shall have written or printed on their ballots, "Against the loan," and if a majority of the votes cast at such election be against the loan, it shall not be 'made.

The provisions of the foregoing sections, considered altogether, convince me that the legislature intended to authorize the boards of county commissioners in this state to submit to the electors of their respective counties either one of two distinct and different methods of raising funds wherewith to erect permanent county buildings.  Sec. 18 provides for a system of direct and immediate taxation.  Subdiv. 4 of § 16, and §§ 17, 19 and 20, contemplate a different system, the voting and issuing of bonds, the pledging of the credit of the county, payable at some future period, whereby the necessary fund is raised.  The first plan might not inaptly be called the "cash" system, the other the "credit" system, because, in the first method, unless the commissioners can induce the persons who may furnish labor and materials for the erection of the buildings to wait for their pay until it can be raised by successive annual levies of taxes (a result altogether improbable), the money to pay them must necessarily be raised by a levy *en masse*, and accumulated in the county treasury to meet their demands as the work progresses.  In a young state like Kansas, where the great majority of the people are taxing their financial energies to the utmost to open and improve their farms, or establish themselves in other respective vocations, the plan of erecting county buildings by direct and immediate taxation

would not be desirable. The legislature, therefore, as it seems to me, deemed it only wise and prudent to provide another method of raising money for such a purpose, which is by issuing and negotiating the bonds of the counties. Under that plan, the debt can be liquidated in deferred payments, extending through a series of years. The annual interest, of course, must be paid as it matures, but the payment of the principal can be deferred for such a reasonable length of time as will enable the county, in consequence of augmented wealth and population, ultimately to extinguish the debt with comparative ease; and as a circumstance indicative of the legislative interest in this regard, it is worthy of notice that in order to shift some of the burden of such a debt from the shoulders of the pioneer classes upon those of persons who may locate in a county which enjoys the advantage of good substantial public buildings, railroads, or other public enterprises for which bonds may be voted, the legislature has provided, in substance, that the levying of a tax to create a sinking fund to redeem such bonds may be deferred by the county boards for a term of years not more than one-third of the time such bonds may have to run from their issue to maturity. (Dass. C. L., ch. 25, § 210.)

I arrive without any difficulty at the conclusion that the legislature has authorized these two respective modes of raising money to pay for the erection of public buildings. In the case at bar, the commissioners adopted and submitted to the voters the proposition of raising the money by means of a loan. The order they thereupon made, and which was embodied by the sheriff in the notice he gave of the election, clearly and unmistakably informed the electors of the nature of the proposition they were to vote upon. The ballots that were used at said election in voting on said proposition, conformed to the statute and the notice, so far as the evidence discloses, reading respectively "For the loan," and "Against the loan." The conclusion being reached that the law contemplates and permits two different methods to be submitted to the voters respecting the raising of money to erect public buildings, each method seeking to accomplish the very same public enterprise, what utility would there be, or what good reason, in requiring the people to have two elections, as contended by counsel for plaintiff, in order to accomplish the very same results? The law does not require the performance of useless or unnecessary things. Moreover, this first election that the plaintiff insists is a condition precedent to the second election, is to be had according

to the very words of the statutes to empower the commissioners to *assess a tax* for the purpose of building permanent county buildings; and after the electors have done that, and authorized their agents, the commissioners, to levy a tax, is that all to go for naught, and simply serve no other purpose than to authorize the commissioners to subject the people to the expense of another election in which they are to determine whether or not they will issue bonds to raise money to be used for the same purpose which they have already voted may be raised by direct taxation? I cannot believe that the legislature ever intended to compel the people to pursue such a round-about and circuitous course to enable them to determine the question whether or not they would build a court-house, and I therefore conclude that the first proposition contended for by the plaintiff is untenable.

The plaintiff, however, further insists that under the aforesaid § 19, before the board can submit to a vote of the electors the question of raising any sum of money by loan, the said board must "determine" the sum necessary to be raised, and give notice of such "determination," which plaintiff claims was not done in this case. In support of his contention that there was no determination by the board of the amount necessary to be raised before the question was submitted to the people, the plaintiff has introduced the affidavit of one of the commissioners, who swears that the board did not, at the time of making the order submitting the question, nor at any other time prior to the making of such order for an election, make any investigation, decision or determination as to the actual or probable cost of a jail or court house, or both together, or as to the amount or sum of money necessary to build the same, or as to the sum necessary to be raised for the purpose of building permanent county buildings in said county.

The chairman of the board, as shown by the evidence, was absent from the state when this hearing was had, but the affidavits of the other commissioner and the county clerk were introduced by the defendants, wherein they testify that the question was very fully and carefully discussed and considered, and as a result thereof, the board, every member being present, concluded and determined that thirty thousand dollars was the sum necessary to be raised. The evidence further shows that there was a petition presented to the board, signed by some sixty or more individuals, petitioning them to make the order they subsequently did.

The board finally made the following order, which was entered on their journal.

[See in the beginning of statement, a copy of the order.]

It was subsequently ascertained that the time fixed for the election was too short to enable the sheriff to give the notice required by law, and thereupon two of the commissioners united in a written request to the chairman of the board to call a special meeting for the purpose, among other things, of fixing a different day for the said election. The chairman thereupon issued his call, in accordance with said request, and the board met in special session, every member being present, and a different day for said election was fixed, and the sheriff was ordered to give due notice thereof.

After all these things had been done by the board, it would seem as if it was bordering slightly on the ridiculous for a court to hold that these gentlemen did not know what they were about; that they have determined nothing; that they had simply been acting automatically, and that the whole proceeding was an expensive farce. I do not think that the evidence on this proposition is sufficient to justify me in holding that the county commissioners of Wilson county transact the public business in that kind of a way.

The plaintiff further claims that in the townships of Neodesha, Newark, Cedar, and Chetopa, the sheriff did not give notice of the election as required by law. As already stated, the notice he was required to give was by posting written or printed handbills in five of the most public places in each township, for at least thirty days preceding the day of the election. (Dass. C. L., ch. 25, § 19.)

A number of affidavits have been introduced in evidence by the plaintiff which tend to show that so far as the affiants were concerned, they saw no printed notices of election in the aforesaid townships. On the other hand, the sheriff swears positively that he did post the notices, and he is strongly corroborated by other witnesses as to some of the notices in some localities. The first question that may be considered on this issue is as to the weight to be given the evidence for and against this proposition. It has not been shown in this case, and there is nothing in the circumstances of the case from which the court could even infer it, that the sheriff is a biased witness in favor of the defendants. All presumptions are therefore in his favor, that he, a public officer, acting under the restraint of an oath and the obligation of a bond, properly discharged his duty in this regard. And does the fact alone

that parties swear they saw no notices in the places where the sheriff testifies he posted them, necessarily prove that they were not posted? The life of these paper notices is of the most ephemeral and perishable character. Placed generally, as they were in this case, on the exterior surface of buildings, or on posts or trees, they are exposed to the destructive action of the wind and rain, or thoughtless or evil-disposed boys or men may carelessly or wantonly destroy them long before the notices have fulfilled their destined purpose. Hence the testimony of individuals to the fact alone that they saw no notices where the sheriff says he posted them, should be carefully and cautiously weighed and considered before it should be allowed to overthrow the positive evidence of the sheriff that he did post the notices. And this consideration should obtain with still greater force when the individuals testifying to the absence of the notices are probably, in the main, as may be fairly inferred from all the evidence, facts and circumstances in the case, hostile to the proposition which was voted on, and desirous of seeing the election adjudged void.

It is also claimed by the plaintiff, and evidence has been introduced tending to show, that the notices posted in the townships of Cedar, Chetopa and Newark were not judiciously distributed over the entire townships in such a manner as to attract the attention of the great body of the people, and that they were distributed over only a small portion of the area of said townships. In the light of the evidence which is before me on that matter, I am inclined to think that it would have been better if there had been a more general distribution of the notices, but still there must be some discretion exercised by the sheriff in such a duty, and it would necessarily require strong and convincing evidence, (in the absence of any evidence tending to show fraud or collusion by the officer,) that would constrain a court to hold that a public officer had manifestly abused his discretion in so simple a matter as the posting of the notices of an election.

But above and beyond this matter of the statutory notice of an election is this controlling principle of law, that if notice in fact of such election is brought home to the great body of electors, though derived through means other than the proclamation which the law prescribes, such election is valid. In this case, while the plaintiff claims there was no sufficient posting of the notices in Neodesha township, yet there is not a syllable of proof, and it is not even claimed, that that township did not poll at least its full and ordinary vote. As regards the

townships of Cedar, Chetopa, and Newark, the fact alone has been shown by the plaintiff that those townships did not poll their full vote. There has not been a syllable of proof, however, introduced by the plaintiff to show that the failure to poll the full vote was owing to the fact that the electors did not know of the election, (with one single exception, presently to be mentioned.) It is undisputed that an election was held in every township, and the defendants have introduced evidence which is uncontradicted, that the proposition to vote bonds to erect public buildings had been most thoroughly discussed, and was universally known; that at least two of the local papers of the county, with a fair circulation in said townships, had published the notices of the election for several weeks previous thereto; that those townships had been organized in opposition to the proposition, and that the true cause of their light vote was owing to the fact that one of the severest rain storms which ever visited this county prevailed throughout the county the greater part of election day and a portion of the preceding day; that in consequence thereof, and the swollen and impassable condition of the creeks and streams resulting therefrom, many of the voters of those townships did not go to the polls, and hence the comparative lightness of the vote. And a most significant circumstance, as tending to show how unfounded must be the claim that the voters of Wilson county were ignorant of the pendency of this election, is the fact that the able and industrious counsel who appear for the plaintiff, amid the multitude of affidavits which they have obtained and introduced on other questions in the case, have been able to find only one man in the county who is willing to swear that he was ignorant of this election. And I am clearly convinced that for me to hold, under the evidence, facts and circumstances of this case, that the great body of the electors of this county, or even any considerable portion of them, were misled by the alleged failure of the sheriff to post up these paper notices, would simply be sacrificing substance to form, besides being a totally unwarranted reflection on the intelligence of the voters of the county.

I have carefully examined the cases of *George v. Oxford Township*, 16 Kas. 72; and *Wood v. Bartling*, id. 109. But the facts of those cases are widely and totally different from the case at bar, as can be seen at a glance. I understand the rule of law on this question to be substantially as declared by the supreme court of Ohio in *Foster v. Scarff*, 15 Ohio St. 532. It is true that where notice was not given according to law of

an election to fill a vacancy in the office of probate judge, and where it was also apparent that the great body of voters had in fact no notice, and were not aware that the office was to be filled, and when a small number cast their votes for a single candidate, and no votes were cast for any other,—under all these circumstances, the court held the election void. Still, they were careful to lay down the law in these words: "In deciding this case, however, we do not intend to go beyond the case before us, as presented by its own peculiar facts. We do not intend to hold, nor are we of opinion, that the notice by proclamation, as prescribed by law, is *per se*, and in all supposable cases, necessary to the validity of an election; if such were the law, it would always be in the power of a ministerial officer, by his malfeasance, to prevent a legal election. We have no doubt that where an election is held in other respects as provided by law, and *notice in fact* is brought home to the great body of the electors, though derived through means other than the proclamation which the law prescribes, such election would be valid." See also *Dishon v. Smith*, 10 Iowa, 212; *People v. Hartwell*, 12 Mich. 508; McCrary on Elections, § 116.

The plaintiff further complains of a matter which occurred in the voting precinct of North Fall River. It appears that the electors of that township, on the same day of the court-house bond election, voted on a local proposition to build a bridge over Fall river, in said township. The trustee of the township, acting in good faith and under legal advice, caused a separate election board to be organized to receive the votes on the local proposition, while he himself remained at the head of the board which received the ballots on the court-house bond proposition. This latter board, at the close of the election, in counting out the votes, found in their box three tickets on the bridge question, only one of which, however, as appears from the evidence, had been intentionally voted, the other two, in the opinion of the election board, having been accidentally folded in the court-house bond ticket. And this is all there was of it. So far as the election which is assailed is concerned, it is not shown that a single voter was deprived of his vote, or that anything else occurred to prevent a fair and full expression of the popular will.

I come now to the consideration of the charge made by the plaintiff, of illegal voting in Center township. As I have already stated, the plaintiff had attached to his petition a list of 181 names claimed to be fraudulent votes. This list is designated exhibit B, and for brevity I will so designate it.

In support of this allegation, the plaintiff has read in evidence the affidavit of two of his counsel, in which they say in substance that they have compared said list of names with the poll books of Center township, of the elections of November, 1884, and of February, 1885, and with the census returns of said township made by the township trustee in the spring of 1885, and that none of the names on exhibit B appear on either of the poll books of the general election of 1884, or of the February election, 1885, or upon the census returns, except about twenty names which appear on said census returns as persons under the age of twenty-one years. These census returns and poll books were also introduced in evidence. Plaintiff also introduced the affidavit of one W. D. Lee, who swears that he lived in Fredonia, in Center township, for about three years; that he left there, however, about a year and a half ago, but that he has frequently been there since on business, and·that he knows the people of the township. Mr. Lee further swears that he has examined the list of names in exhibit B, and with the exception of about ten or a dozen that he specifies by name, he says he "does not recognize" any of them as voters or residents of said township. In the closing part of his affidavit, he says he is "quite certain" that as to the names on exhibit B not excepted by him, said persons were not residents or voters in Center township on September 7, 1885. An affidavit was also read, made by a gentleman of North Fall River precinct, as to certain alleged illegal voting there, but this affidavit related mainly to the "belief" of the affiant, and as a piece of evidence is not of much value. It is also contradicted in strong terms by the affidavit of the trustee of the township, who acted as one of the judges of the election at said precinct. This I believe to be a fair statement of the substance of all the evidence introduced by the plaintiff to sustain the charge of fraudulent voting at the election. The solitary affidavit of Mr. Lee is met by the defendants with about 160 affidavits testifying in substance to about that number of persons on exhibit B being actual residents and legal voters in Center township on the day of election. A number of these affidavits are made by the alleged fraudulent voters themselves, the others are made by persons who swear in substance that they have actual knowledge of the matters about which they testify. In a number of these affidavits the places where the alleged fraudulent voters live and their occupations are stated and pointed out with minuteness. In the face of this overwhelming mass

of testimony, I am simply forced to the conclusion that Mr. Lee certainly must be very greatly mistaken. In the first place, it would be a very difficult matter for him, in his three-years residence in the township, to form the personal acquaintance of between 600 and 700 voters, and retain the facts in his memory, after a residence of a year and a half in another locality, with sufficient clearness and distinctness to enable him to testify with any great degree of positive conviction. In what part of the county he resides now I do not know, as his affidavit does not disclose. It is, moreover, fairly presumable that during his aforesaid absence new-comers would locate in the township, whom to-day he could most truthfully swear, in the language of his affidavit, that "he did not recognize" as voters or residents. The plaintiff's counsel has criticised the affidavits filed in rebuttal of that of Mr. Lee, as stating merely conclusions of law and not facts. They are far less obnoxious to that objection than is the affidavit of Mr. Lee, as a simple comparison of the different affidavits will show.

The fact that Center township polled a larger vote at the election September 7th than at the spring election this year, or the general election last fall, has been pressed upon my attention as almost a conclusive indication of fraud. It is true that according to the poll books, Center township polled 682 votes at the court-house bond election, while at the general election in November, 1884, she polled only 560. When the circumstances are considered, however, does it follow that the increase of 122 votes, or any considerable portion of them, is fraudulent? A period of ten months had elapsed since the former election, which in itself is enough to produce, in this western country, a certain proportion of natural and legitimate increase of the voting population. It was further shown by affidavits (and not denied by the plaintiff), that in Center township are a large number of that class of persons who belong to the religious denomination known as "Dunkards," who, as was sworn to, have not heretofore voted at general elections, but who did vote at the court-house bond election. It is also a fact within the general knowledge of every person who has witnessed a county-seat election, or one involving a matter closely allied therewith, that such elections, especially in the localities directly interested, have the effect to bring out the voters more completely than even a presidential election.

But it is insisted that the failure of the counsel for plaintiff to find any of the names on exhibit B in the census returns

made by the township trustee in the spring of 1885, is another strong indication of fraud. I will remark in the first place, that such census returns are generally conspicuously inaccurate, and their reputation in that regard is notorious. Of course there are exceptions, where individual trustees may and do take pains and trouble to make their returns full and complete, but such cases are certainly not the general rule. In this case, Mr. Tuttle, the county clerk, the custodian of the books containing these census returns, swears that a number of legal voters in the township are known to him, whose names do not appear on said assessment rolls.

I will also say that as these assessment rolls were introduced in evidence, I have taken the trouble myself, without the benefit of any assistance in the matter, to compare the list of alleged fraudulent voters on exhibit B with the names in said returns, and I have found a number of names of persons in the returns, apparently legal voters, who are named in the exhibit as fraudulent. I have also found other names which, while not exactly corresponding in every particular with the list on the exhibit, are so closely similar as to fairly justify the inference that they are the same, and that the seeming dissimilarity is simply owing to the error of the clerk of the election board in writing the name of the voter, committed in the hurry and confusion incident to an election.

Now, under all these circumstances, has the plaintiff made out a case sufficiently strong to justify the court, in the exercise of a sound judgment and discretion, to stretch forth its hand, and by the exercise of the extraordinary process of injunction, tie up and paralyze the will of the people of Wilson county, as expressed at the polls, and indefinitely postpone the erection of suitable public buildings needed for the use, accommodation and necessities of the public? This is a matter which, in a greater or less degree, concerns every citizen of Wilson county. While there may be jealousies and animosities among the rival towns within her borders, every land-owner in the county, irrespective of locality, who may be concerned for the certainty and stability of the recorded title to his home, every person who may be concerned in the records of the courts, or any other of the public records of the county, has some interest in this question. And sitting here now in the capacity of a court, in the ancient and dilapidated structure, by courtesy denominated a court house, I cannot shut my eyes to the immediate surroundings, and I feel a conscientious conviction that I should not lightly, upon dubious

and uncertain grounds, lay impediments in the way to prevent the people of this county from constructing a suitable court house, if they have so expressed their desire at the polls in accordance with law. And this matter of the public interest is not improper to be considered in this connection. A writer of acknowledged authority on the law of injunction has said: "In granting an injunction, the court is bound to consider the amount of injury which may be inflicted on strangers to the suit and third persons." (1 Joyce on Injunctions, 497.)

I fully realize the importance of this decision, made at this stage of the case, to the people of Wilson county, but in the light of all the evidence which has been presented to me, which I have tried to examine with dispassionate judgment and conscientious care, I have arrived at the conclusion that there has not been such a showing made as would justify or even authorize me to grant a temporary injunction.

The application therefor will consequently be overruled, and the restraining order heretofore granted is set aside.

The plaintiff excepted to the rulings of the district court, and to reverse the order refusing a temporary injunction, brings the case here.

*J. K. De Moss, J. W. Sutherland,* and *C. F. Hutchings,* for plaintiff in error.

*B. M. Short,* county attorney, *C. C. Chase, S. S. Kirkpatrick,* and *T. J. Hudson,* for defendants in error.

The opinion of the court was delivered by

HORTON, C. J.: The plaintiff, in his action now pending, seeks to contest the election of September 7, 1885, held in Wilson county on the proposition to issue $30,000 of bonds of that county for the purpose of erecting permanent county buildings in the city of Fredonia, upon two grounds: *First,* that there were illegal and fraudulent votes enough cast in favor of the proposition, to change the result; *second,* that the election itself was illegal and invalid, not being called or conducted in compliance with any law; and that no legal notice thereof was given. It is insisted on the part of plaintiff, that where an action is commenced under the provisions

of §§ 112 and 116 of chapter 36, Comp. Laws of 1879, to restrain the officers of any county from executing, issuing or delivering bonds, a temporary injunction should be granted as a matter of right on the filing of a verified petition, and in any event that the elector bringing his action to contest the election should be required to make only a *prima facie* case to entitle him to a temporary injunction. In support of this, counsel say:

" When the plaintiff in such a case has shown that there is a *bona fide* controversy, the court ought to grant a temporary injunction to preserve the existing status until by the aid of compulsory process and the instrumentality of oral examinations and cross-examinations the truth may be ascertained. To attempt to determine the facts and deny a temporary injunction upon conflicting affidavits, would nullify the statute and render it entirely practical to conceal the fraudulent votes by use of fraudulent affidavits; that if the district court refuses a preliminary injunction, the action to contest the election is practically disposed of and brought to an end, because the final judgment in the case can only be a perpetual injunction against issuing the bonds, and no court would go through the idle and empty ceremony of investigating a case where the final judgment must necessarily be wholly fruitless and ineffectual, not only to prevent the mischief sought to be prevented, but inoperative for any purpose whatever."

Said § 112 reads:

" Whenever any elector or electors of any county, township, or municipal corporation in this state, shall consider himself or themselves aggrieved by the result of any election hereafter held for removing, locating, establishing, or re-locating, the county seat of such county, or upon the question of issuing the bonds or loaning the credit of said county, township or municipal corporation, or for the sale or transfer of any stock or other property owned or held by said county, township or municipal corporation, as said result may have been or shall be declared by the proper board of canvassers, or, if any such elector or electors shall consider himself or themselves aggrieved by the failure or refusal of any board of canvassers to canvass the votes returned from any precinct or precincts, as having been cast at any election held for any or either of the purposes hereinbefore named, such election may be con-

tested in the district court of the proper county, as hereinafter provided."

Section 116 provides:

"Whenever, after any election held for any purpose mentioned in the first section of this act, the board of canvassers shall declare any town, city or place to have received a majority of the votes cast for the county seat, or that any question or proposition voted upon at such election to have been adopted, any elector or electors of the proper county, township or municipal corporation, who may be aggrieved thereby, may commence an action in the district court of the proper county to perpetually enjoin any county officer from moving his office to the city, township or place so by said board declared to be the county seat, or to enjoin and restrain the proper officer or officers of such county, township or municipal corporation, from executing, issuing or delivering any bond or bonds, certificate or certificates, evidencing or importing any debt or liability, or promise to pay, of such county, township or municipal corporation, or from subscribing any stock for, or from loaning the credit of such county, township or municipal corporation, or from selling or transferring any stock or other property of such county, township or municipal corporation."

And § 117 further provides:

"In all actions of injunction brought under the provisions of this act, the practice, pleadings and proceedings shall be in accordance with the rules prescribed in article twelve of the code of civil procedure, so far as the same may be applicable; but no preliminary or temporary injunction shall be allowed or granted by other than the district court or the judge thereof: *Provided, however*, that in case of the absence of said judge from his district, or his illness, or inability to act, any other district judge in the state, or the chief justice, or any associate justice of the supreme court, may grant a temporary injunction in like manner, and with the same force and effect and none other, as temporary injunctions granted by the judge of the proper district court."

Neither within these provisions, nor the provisions of the code, can we say that a preliminary injunction is a matter of strict right. The granting or refusing of a temporary or preliminary injunction rests largely in the sound judicial discretion of the court or

1. Preliminary injunction, not a matter of strict right.

judge to whom the application is made. (*Stoddart v. Vanlaningham*, 14 Kas. 18; *Akin v. Davis*, 14 id. 143; *Conley v. Fleming*, 14 id. 381; *Olmstead v. Koester*, 14 id. 463.) In such a case as this, if the court or judge to whom the application is made for the preliminary injunction is satisfied that there is a *bona fide* controversy over the question whether the proposition to issue bonds has been carried, and sufficient votes cast in favor of the proposition are seriously challenged to change the result, and upon the hearing of the application there is great conflict in the affidavits offered, it would be best for the court or judge, as a general rule, to grant the temporary injunction so that the real facts of the case may be ascertained on the final hearing, upon oral or other competent evidence. The truth of a petition cannot be very satisfactorily determined upon conflicting affidavits. These often consist merely of conclusions and statements of the most general character, and a cross-examination before a judge or court of the witnesses making the affidavits may disclose a very different state of facts. Very much, however, must rest in the discretion of the court or judge hearing the application for the preliminary injunction. Unless that discretion is abused, the refusal to grant a temporary or preliminary injunction will not be interfered with. (*Wood v. Millspaugh*, 15 Kas. 14.)

2. Preliminary injunction — when granted, when not.

We cannot assent to the view that a refusal of a preliminary injunction practically disposes of the case. To permit the bonds to be issued before the questions of fact alleged in the petition are finally determined, may complicate matters, but the refusal to grant the preliminary injunction will not necessarily cause any dismissal of the case, nor prevent a full investigation of the charges made concerning the illegal and fraudulent votes. Of course the district court will grant a speedy trial, and even if the bonds are negotiated, the money derived therefrom cannot be used for the construction of permanent county buildings in Wilson county, or for any like purpose, if it be finally adjudged that the legal votes cast at the election of September 7th were against the proposition

submitted. Where officers have no legal power to act, they cannot plead good faith after they have acted. (*The State v. Harrison*, 24 Kas. 268.)

As all the charges concerning illegal votes must be further and more fully investigated upon the final hearing of the case, we need only say at this time that upon the evidence presented on the application for the temporary injunction, there was no abuse of judicial discretion in the district court in refusing the injunction. Whether the charges of illegal voting shall be finally decided in favor of the plaintiff or in favor of the defendants, after a full and fair trial, we are not prepared to say. The evidence hereafter to be presented must determine.

To establish that the election of September 7, 1885, was invalid, § 18, ch. 25, Comp. Laws of 1879, is cited. This section reads:

"No board of county commissioners shall proceed to build any permanent county buildings, and assess any tax for that purpose, without first submitting the question to a vote of the electors of the county at some general or special election; and said election shall be governed by, and the returns thereof made in accordance with, the laws governing the elections of county officers. The ballots used at said election shall be written or printed—'For the erection of public buildings,' 'Against the erection of public buildings.'"

The contention of plaintiff, is that under the provisions of said section the county commissioners have no power to submit to the electors of the county the question of raising any money by loan to build permanent county buildings until they have first submitted to the electors of the county the distinct and independent proposition of the erection of permanent county buildings; that the ballots voted at said election must be written or printed—"For the erection of public buildings," or "Against the erection of public buildings," and that no permanent county buildings can be so erected until the electors have decided in favor thereof by their ballots cast "For the erection of public buildings." If § 18 were the only provision of the statutes relating to the erection of permanent county

44—34 KAS.

buildings, the claim of the plaintiff would undoubtedly be correct; but § 16, ch. 25, provides that—

"The board of county commissioners of each county shall have power, at any meeting, . . . *Fourth.* [ To ] apportion and order the levying of taxes as provided by law, and to borrow, upon the credit of the county, a sum sufficient for the erection of county buildings, or to meet the current expenses of the county, in case of a deficit in the county revenue."

And § 17 provides:

"The board of county commissioners shall not borrow money for the purposes specified in the fourth subdivision of the preceding section, without first having submitted the question of such loan to a vote of the electors of the county."

Section 19 also provides:

"Whenever it shall become necessary, under the provisions of this act, to submit to a vote of the electors of any county the question of raising any sum of money by loan, the said board, after having determined the sum necessary to be raised, shall cause notice of such determination, and the time when the question will be submitted to the electors of such county, by written or printed hand-bills, posted up in five of the most public places in each township for at least thirty days previous to the time fixed for the taking of such vote."

And § 20 further provides:

"At the time specified in such notice, a vote of the electors of such county shall be taken in each of the townships in such county, at the place designated in the notice. The inspectors receiving the votes shall be the same as required at the general election, and the vote shall be canvassed by the same officers, and in the same manner as required at such general election, and the result of such vote shall be certified by them, and transmitted to the county clerk within ten days after such vote shall be taken, which certified statement shall be delivered by such clerk to the board of commissioners at their next meeting. All voting in the several townships, as provided in this section, shall be by ballot; and those voting in favor of such proposed loan shall have written or printed on their ballots, 'For the loan;' and those voting against the loan shall have written or printed on their ballots, 'Against the loan;' and if a majority of the votes cast at such election be against the loan, it shall not be made."

Considering these various sections, we think the construc-
tion given by the district court reasonable and proper, viz.:
that the legislature intended to authorize the
boards of county commissioners in this state to
submit to the electors of their respective counties
either one of two distinct and ·different methods
of raising funds wherewith to erect permanent county build-
ings; that § 18 provides for a system of direct and immedi-
ate taxation for the construction of permanent county buildings,
after a favorable vote of the electors therefor; and that the
fourth subdivision of § 18, supplemented by the provisions of
§§ 17, 19 and 20, contemplates the raising of a sum sufficient
for the erection of county buildings by issuing and negotiating
bonds, if the electors of the county vote in favor of a loan for
that purpose. (See also § 210, ch. 25, Comp. Laws of 1879.)

3. County board;
power to bor-
row money to
erect perma-
nent county
buildings.

If the construction contended for on the part of plaintiff be
sustained, then two elections are necessary before the board of
county commissioners can proceed to build any permanent
county buildings.   This certainly would be useless and accom-
plish no good purpose.   Counsel for plaintiff suggest, how-
ever, that this construction of the statute leaves it in the power
of the commissioners to erect permanent buildings, without
any consultation with the people, if there exists a surplus fund
in the county treasury.   This is not so. (*The State v. Comm'rs
of Marion Co.*, 21 Kas. 419; *The State v. Harrison*, supra.)
Counsel for plaintiff further suggest that under this construc-
tion of the statute, after an election has been held under § 18
and a majority of the ballots "For the erection of public build-
ings" has been cast, the commissioners may proceed to expend
as much as they please in constructing county buildings.   We
do not assent to this conclusion.   If a vote be ordered for a
direct and immediate taxation to build county buildings, under
§ 18 the board of county commissioners submitting the ques-
tion must necessarily state the cost of the county buildings
proposed to be built, or the total amount of tax proposed to
be assessed therefor.   The amount to be expended must be
stated in submitting the question, and upon this the electors

vote. If they are in favor of expending the amount named for permanent county buildings and assessing a tax therefor, they will vote "For the erection of public buildings;" if opposed to the question, they will vote "Against the erection of public buildings." .

Counsel for plaintiff still further suggest, that if county buildings can be erected upon a vote of the electors for the loan of money therefor, the election is invalid, because the commissioners did not determine, within the terms of said § 19, the sum necessary to be raised. A petition asking that such an election be called was presented to the commissioners on July 9, 1885, and on the same day an election was ordered to be held on August 8, 1885, for the purpose of voting upon the question of issuing the bonds of Wilson county in a sum not to exceed $30,000, for the purpose of erecting permanent county buildings in the public square in the city of Fredonia. On July 15, 1885, the time for holding the election was changed to September 7, 1885, and it was recited in the order that the $30,000 of bonds of Wilson county were to build a court house and jail.

While it would have been better if the county board had stated in the order that it had determined the sum necessary to be raised for the erection of the court house, and also the sum necessary for the jail, we think the order as entered on the journal necessarily implies that the board had determined that $30,000, or at least a sum not exceeding $30,000, was necessary for the erection of the court house and jail. If we go outside of the order, the preponderance of the evidence presented upon the application is, that the sum necessary to be raised for the erection of permanent county buildings was considered and determined by the county board, although not expressly stated in the order entered upon the journal. J. C. Tuttle, the county clerk, testified that the proposition to build a court house and jail was considered, and $30,000 was determined to be the proper sum to build both. A. M. Craig, one of the commissioners, testified that the proposition was considered to build

4. Proposition submitted to voters; implication as to amount.

a court house, and that $30,000 was determined to be the proper sum necessary to be raised for that purpose. In this state it is quite usual, in the construction of court houses, to have the jail in the basement or lower story, and if this plan was considered by the board in making the order, we do not perceive any conflict in the affidavits of J. C. Tuttle, the county clerk, and A. M. Craig, the commissioner.

Finally, it is claimed that the election of September 7, 1885, was invalid because the commissioners did not give notice of the determination required by § 19, and of the time when the question would be submitted to the electors of the county by written or printed handbills posted up in five of the most public places in each township for at least thirty days previous to September 7th. In accordance with the order of the county board, the sheriff issued his proclamation on July 15, 1885, announcing that on Monday, the 7th day of September, 1885, a special election would be held in Wilson county, at the usual voting-places in the several townships in said county, between the hours of 8 o'clock A. M. and 6 o'clock P. M. of said day, and that there would be submitted to the voters of said county to be voted on at said election, the proposition: Shall the board of county commissioners of Wilson county, Kansas, for and in behalf of said county, issue the bonds of said county in a sum not to exceed $30,000, to bear interest at the rate of five per cent. per annum payable semi-annually; said bonds to be in the sum of $1,000 each; two of said bonds to be payable five years from date thereof, and two of said bonds to be payable each year thereafter until the whole are paid, for the purpose of erecting permanent county buildings in the city of Fredonia, Wilson county, Kansas; those in favor of the proposition, to have written or printed on their ballots the words "For the loan;" those voting against the proposition to have written or printed on their ballots "Against the loan"? This proclamation or notice was sufficient, if properly published or posted up, although "permanent county buildings" were named instead of "a court house and jail." The statute requires written or printed handbills to be posted up in five of the most public places in each township.

5. Notice;
sufficient
posting.

The evidence of the sheriff shows that five notices were posted up in each township, but the contention is, that the notices were not judiciously distributed over the townships in such a manner as to attract the greatest attention of the electors — that is, that they were not posted up in five of the most public places in each township. Upon the affidavits presented, although conflicting in their terms, there was sufficient evidence before the court to find that the proclamation or notices for the election were posted up in compliance with the terms of the statute; but as this matter will be investigated again upon the final trial, we purposely decline to comment upon the evidence offered. Undoubtedly, the commissioners could appoint the sheriff to post up the notices, and if he performed this duty in good faith, not acting corruptly or partially, the posting will be sufficient, although the witnesses differ as to whether the handbills were posted up in the most public places in the townships.

The order of the district court refusing a temporary injunction will be affirmed.

All the Justices concurring.