# IN THE SUPREME COURT OF CALIFORNIA

LESLIE T. WILDE,

Plaintiff and Appellant,

v.

CITY OF DUNSMUIR et al.,

Defendants and Respondents.

S252915

Third Appellate District
C082664

Siskiyou County Superior Court
SCCVPT16549

---

August 3, 2020

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Groban concurred.

---

WILDE v. CITY OF DUNSMUIR
S252915


Opinion of the Court by Kruger, J.


The California Constitution grants voters the power of referendum, which allows them to approve or reject laws enacted by their elected representatives before the laws take effect.  But to prevent the referendum process from disrupting essential governmental operations, the Constitution exempts certain categories of legislation, including "statutes providing for tax levies or appropriations for usual current expenses" of the government.  (Cal. Const., art. II, § 9, subd. (a).)  The question in this case is whether this exemption applies to measures setting municipal water rates.  We conclude the answer is yes.  Municipal water rates and other local utility charges may be challenged by other means, but they are not subject to referendum.

**I.**

**A.**

Under the California Constitution, "[t]he legislative power of this State is vested in the California Legislature . . . but the people reserve to themselves the powers of initiative and referendum." (Cal. Const., art. IV, § 1.) The powers of initiative and referendum were enacted as part of the Constitution in 1911 as companion reforms.  The initiative power allows voters to propose new measures and place them on the ballot for a popular vote.  If the measure is approved by popular vote, it becomes law.  (Cal. Const., art. II, § 8; *id.*, § 10, subd. (a).)  The

referendum power, by contrast, allows voters to weigh in on laws that have already been passed by their elected representatives. Any voter or group of voters that gathers enough signatures can place a legislative enactment on the ballot for an up or down vote. A referendum suspends operation of the law until it is approved by a majority of voters. (Cal. Const., art. II, § 9, subd. (a); *id.*, § 10, subd. (a); see *City of Morgan Hill v. Bushey* (2018) 5 Cal.5th 1068, 1078 (*City of Morgan Hill*).) Like the initiative power, the referendum power applies to both state statutes and local enactments. (Cal. Const., art. II, § 11, subd. (a) ["Initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide"]; *City of Morgan Hill*, *supra*, 5 Cal.5th at p. 1078; cf. Elec. Code, §§ 9141 et seq. [extending referendum to county electors], 9235 et seq. [extending referendum to electors of general law cities].)

The referendum power is, however, subject to certain exceptions. These exceptions are spelled out in article II, section 9, which provides, in relevant part: "The referendum is the power of the electors to approve or reject statutes or parts of statutes *except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State.*" (Cal. Const., art. II, § 9, subd. (a), italics added.) Although this section is, by its terms, addressed to state statutes, the same exceptions apply to local legislation. (*Rossi v. Brown* (1995) 9 Cal.4th 688, 698 & fn. 4 (*Rossi*); *Geiger v. Board of Supervisors* (1957) 48 Cal.2d 832, 836–837 (*Geiger*);

*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591–592, fn. 7.)[1]

## B.

Several decades after the powers of initiative and referendum were established in the Constitution, voters enacted a series of reforms aimed at increasing voter control over revenue-raising measures. These provisions are of limited relevance to our decision in this case, for reasons we explain below, but help to explain the history of this litigation and the nature of the parties' arguments in this court.

The series of reforms began with Proposition 13, a ballot initiative passed in 1978 to cap increases in property taxes and assessments, as well as other state and local taxes. Then, in 1996, voters passed Proposition 218, which further curbed state and local government authority to generate revenue through taxes and other exactions. Finally, in 2010, voters approved Proposition 26, which expanded the reach of these limitations by broadening the definition of "tax" to cover "any levy, charge, or exaction of any kind imposed by a local government," subject to several specified exceptions. (Cal. Const., art. XIII C, § 1, subd. (e); see generally *City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1199–1200.)

The provisions most relevant here are articles XIII C and XIII D of the California Constitution (hereafter articles XIII C and XIII D), which were added by Proposition 218. These

---

[1] Charter cities have more leeway and "may reserve a broader referendum power to the voters" than is reserved in the Constitution. (*Rossi, supra,* 9 Cal.4th at p. 698; see also, e.g., *Rubalcava v. Martinez* (2007) 158 Cal.App.4th 563, 571.) The City of Dunsmuir is, however, a general law city.

articles set out detailed procedural and substantive requirements for imposing or increasing various types of government exactions. Article XIII C requires the approval of either a majority or two-thirds of voters before new or increased local taxes take effect, depending on the type of tax. (Art. XIII C, § 2.) Article XIII C also affirms voters' power to reduce or repeal local taxes, assessments, fees, and charges through the initiative process. (*Id.*, § 3.) Article XIII C does not address the availability of the referendum.

Article XIII D circumscribes state and local government authority to impose or increase property-related taxes, assessments, fees, and charges. Under this article, a fee or charge is defined as "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property-related service." (Art. XIII D, § 2, subd. (e).) These are commonly referred to as property-related fees and charges — a category that includes water service fees. Before levying new or increased fees or charges, article XIII D requires the relevant government authority to conduct a public hearing and allow property owners who are affected by the exaction to submit written protests. If a majority of affected owners file protests, the exaction cannot be imposed. (Art. XIII D, § 6; see *Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 381–382.) In general, property-related fees and charges must also be approved by either a majority of affected property owners or two-thirds of voters. Fees for sewer, water, and refuse collection services are, however, exempt from this voter approval requirement. (Art. XIII D, § 6, subd. (c).)

With this backdrop in mind, we turn to the facts of the case before us.

## C.

The City of Dunsmuir is known for its water.  Located on the Upper Sacramento River, just south of Mount Shasta, the City draws its water from natural mountain springs and dubs it the "Best Water on Earth."  The City pumps, stores, and distributes this water to its residents using a water system that the City owns and operates.  The City pays for this system using proceeds from monthly water rates paid by the City's residents.

Like any public utility, the water system requires regular repair and periodic improvements.  In 2014, the City conducted an assessment of the improvements needed to meet the City's projected water needs.  This assessment concluded that a significant number of the system's aging water main sections required replacement and that the water storage tank, which is more than 105 years old, would need to be upgraded "to insure water pressure and fire protection in major sections of the City."  As the City explained in a public notice, 50,000 feet of old water pipes had remained in the ground well past their lifespan, and an "extremely large number of leaks" pervaded the water system, leading to regular loss of water and a "continuous need to decontaminate large sections of water mains adjacent to the break in the pipe." The City's aging water tank likewise suffered from leaks.  The City also commissioned a study to evaluate its water rates, which were at the time based on a 20-year-old water plan.  The study proposed new water rates that would raise the funds necessary for the infrastructure improvements.

In early 2015, the City appointed a committee of city council members and community members to evaluate the

proposed water rates. (*Wilde v. City of Dunsmuir* (2018) 29 Cal.App.5th 158, 164 (*Wilde*).) The committee recommended new rates to support the replacement of the water storage tank and water mains. (*Ibid.*) Plaintiff Leslie T. Wilde, a Dunsmuir resident, opposed the proposed rates. She has attempted to block them by various means.

Wilde's first attempt came in March 2016, when the city council held a public hearing on the proposed water rates. (*Wilde*, *supra*, 29 Cal.App.5th 164, 165.) Consistent with the requirements of Proposition 218, the City issued public notice of the hearing and provided an opportunity for residents to submit objections via protest ballots. Wilde organized the protest effort, but it yielded only 40 protest ballots — far short of the approximately 800 that would have been needed to halt the rate increase. (*Wilde*, at p. 165.)

The city council thereafter passed Resolution 2016-02 (Resolution), establishing a five-year plan for a $15 million upgrade to the City's water storage and delivery infrastructure. (*Wilde*, *supra*, 29 Cal.App.5th at p. 165.) The Resolution set new water rates that vary based on the amount of water used, the type of residential unit served, and the diameter of the water supply pipe in place. (*Ibid.*)

Having led the failed Proposition 218 preadoption protest, Wilde next attempted to undo the Resolution in two ways. First, almost immediately after the city council passed the Resolution, Wilde submitted a petition for a referendum seeking to overturn it. (*Wilde*, *supra*, 29 Cal.App.5th at p. 165.) Second, Wilde gathered signatures for an initiative that would implement a different water rate schedule. The initiative appeared on the November 8, 2016, ballot but was rejected by voters. (*Ibid.*)

Wilde's proposed referendum, by contrast, was never submitted to voters. The City declined to place the referendum on the ballot, telling Wilde, "The setting of Prop. 218 rates is an administrative act not subject to the referendum process. Also, Proposition 218 provides for initiatives (Art. XIIIC, sec. 3), but not referenda." In response, Wilde filed a petition for a writ of mandate seeking to compel the City to place the referendum on the ballot. (*Wilde*, *supra*, 29 Cal.App.5th at p. 165.) The trial court denied Wilde's writ petition, agreeing with the City that Proposition 218 allows voters to challenge property-related fees by means of initiative but not referendum.[2]

The Court of Appeal reversed. (*Wilde*, *supra*, 29 Cal.App.5th at p. 179.) Like the trial court, the Court of Appeal focused its attention primarily on Proposition 218. The court noted that article II, section 9 of the California Constitution (hereafter article II, section 9) exempts tax measures from

---

[2]    The trial court also concluded the City's water-rate setting was an administrative act, not a legislative one, and therefore not subject to referendum. (See *Yost v. Thomas* (1984) 36 Cal.3d 561, 569–570 [explaining that the initiative and referendum are available only to challenge "legislative acts by a local governing body" and not administrative acts].) The Court of Appeal disagreed, concluding that the Resolution is, in fact, a legislative act. (*Wilde*, *supra*, 29 Cal.App.5th at pp. 172–175.) The City has not sought review of this aspect of the Court of Appeal's decision.

The City also argued below that the issues in this case were moot since voters had already rejected Wilde's proposed initiative. The Court of Appeal rejected the claim (*Wilde*, *supra*, 29 Cal.App.5th at p. 164), and the City has not raised the challenge again here. In any event, we agree that the failure of Wilde's initiative does not moot her request to place a referendum on the ballot.

referendum, but reasoned the exemption does not apply here because both parties agreed that the water charges are a "property-related fee" and not a "tax" under Proposition 218. (*Wilde*, at p. 172, fn. 3.) The court rejected the City's argument that the water rates must be exempt from referendum because a referendum would suspend implementation of the rates and disrupt the City's ability to provide an essential government service, explaining that the City could always revert to its old rates or craft a new water plan. (*Id*. at pp. 175–179.) The court remanded the case with directions to the trial court to issue a peremptory writ of mandate ordering the City to place the referendum on the ballot in the next municipal election. (*Id*. at p. 179.)

In view of the importance of the issue presented to local governments and ratepayers across the state, we granted review. Shortly thereafter, a different panel of the Court of Appeal addressed a similar issue and arrived at a different conclusion in *Howard Jarvis Taxpayers Assn. v. Amador Water Agency* (2019) 36 Cal.App.5th 279. The court there held that a local water agency's resolution adopting new water service rates for its customers is exempt from referendum as a tax measure under article II, section 9 and that the scope of this exemption was not altered by Proposition 218. (*Amador,* at pp. 283–286, 304.)

We reach the same conclusion as the *Amador* court and reverse the contrary judgment of the Court of Appeal in this case.[3]

## II.

## A.

Article II, section 9, subdivision (a) provides, as relevant here: "The referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State." The question before us is whether a measure instituting new municipal water rates qualifies as a tax measure exempt from referendum.

Article II, section 9 does not define the term "tax." Wilde contends that to understand its meaning, we should begin by looking to articles XIII C and XIII D, both added by Proposition 218. The parties do not dispute that for purposes of the substantive and procedural requirements established by these

---

[3]      For purposes of addressing the merits of Wilde's claim, the City asks us to take judicial notice of two documents: (i) the Howard Jarvis Taxpayers Association's "annotation" of Proposition 218, dated September 5, 1996, as it was reprinted in the League of California Cities Propositions 26 and 218 Implementation Guide dated May 2017, and made available on the League's website; and (ii) the Howard Jarvis Taxpayers Association's Proposition 218 "Statement of Drafters' Intent." The request is denied. Neither the existence nor the content of these documents is relevant to our resolution of the case. (See *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1147, fn. 5; see also *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 904; *Mission Springs Water Dist. v. Verjil* (2013) 218 Cal.App.4th 892, 921, fn. 6.)

provisions, the new water rates are categorized as "fees" — specifically, "property-related fees" — rather than "taxes." (Art. XIII D, § 2, subd. (e); *id.*, art. XIII C, § 1, subd. (e) [defining "tax" for the purpose of article XIII C]; see *Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 426–427.) Wilde contends — and the Court of Appeal in this case agreed — that the same should be true under article II, section 9.

We see no reason why that should be so. We have long recognized that " 'tax' has no fixed meaning, and that the distinction between taxes and fees is frequently 'blurred,' taking on different meanings in different contexts." (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 (*Sinclair Paint*); accord, e.g., *Mills v. County of Trinity* (1980) 108 Cal.App.3d 656, 660 [" 'Tax' is a term without fixed definition. The word may be construed narrowly or broadly depending on its particular context and the purpose for which the definition is to be used"].) There is no reason why an exaction cannot be both a "fee" under article XIII C or XIII D and a "tax" within the meaning of article II, section 9 (or any other constitutional provision, for that matter).

The definitional provisions of both articles XIII C and XIII D begin with the phrase "As used in this article" and do not purport to apply to other provisions of law. (Art. XIII C, § 1; art. XIII D, § 2; see *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 213–216 [discussing article XIII D, § 2].) Nor do the articles contain any other indication of intent to alter or amend the meaning of "tax" as used in any other constitutional provision — including the referendum provision, which predates articles XIII C and XIII D by several decades. In the absence of such an indication, we presume no alteration or amendment was intended. (See, e.g., *City and County of San*

*Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 563; see also, e.g., *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540–541 ["Implied amendments or repeals by implication are disfavored"].)

Wilde asserts we must impose a common definition of "tax" to harmonize articles XIII C and XIII D with the referendum provision. But while we have a duty to harmonize constitutional provisions where possible, this duty does not compel us to graft the tax terminology of articles XIII C and XIII D onto the referendum provision when the voters have not chosen to do so. Wilde points out that, broadly speaking, the referendum provision's taxation exception and articles XIII C and XIII D all concern voter control over government finances. But this is not reason enough to impose the definition of "tax" from articles XIII C or XIII D on the referendum provision. The two more recently enacted articles do not constitute a comprehensive "revision of the entire subject" of voter involvement in revenue measures. (*City and County of San Francisco v. County of San Mateo*, *supra*, 10 Cal.4th at p. 563.) Nor does the operation of articles XIII C and XIII D depend in any way on whether the taxation exception covers exactions that are considered "fees" for purposes of these articles. Even as articles XIII C and XIII D detail various methods for challenging government exactions — including voter initiative — neither so much as mentions the referendum. In the absence of any clear connection between these two parts of the Constitution, let alone a conflict, there is no reason to "harmonize" articles XIII C and XIII D with the referendum provision in the manner Wilde proposes. In short, the constitutional provisions added by Proposition 218 do not control whether the water rates at issue are subject to challenge by referendum.

## B.

We return, then, to the question before us:  Is a measure adopting water rates exempt under the referendum provision as a "statute[] providing for tax levies?"  (Art. II, § 9, subd. (a).)  Again, the word "tax," on its own, has no single "fixed meaning." (*Sinclair Paint*, *supra*, 15 Cal.4th at p. 874.)  This was as true in 1911, when the referendum provision was adopted, as it is today.  Dictionary definitions for "tax" from the turn of the century reference a wide range of exactions paid to a government authority for public purposes, including:  "a ratable portion of the produce of the property and labor of the individual citizens, taken . . . for the support of government, for the administration of the laws, and as the means for continuing in operation the various legitimate functions of the state"; "the enforced proportional contribution . . . levied by the authority of the state for the support of the government, and for all public needs"; and "any contribution imposed by government upon individuals, for the use and service of the state, whether under the name of toll, tribute, tallage . . . or other name."  (Black's Law Dict. (2d ed. 1910) pp. 1136–1137; see also *id.* at pp. 1138–1139 [defining "taxation"].)  The City's water rates fit comfortably with the scope of several of these definitions of "tax," if not all of them:  Municipal water rates are contributions imposed by the municipal government upon individuals for a service provided by the municipality — namely, the delivery of water.[4]

---

[4]     The use of the word "levy" adds nothing of substance to the analysis.  In its verb form, the term meant to "lay or impose a tax," and sometimes, to collect taxes.  (Black's Law Dict., *supra*,

Judicial decisions from the time of article II, section 9's passage likewise make clear that the term "tax" was understood to be capacious enough to cover charges for municipal utility services. In *City of Madera v. Black* (1919) 181 Cal. 306 (*City of Madera*), for example, this court explained that rates charged to fund the construction of a municipal sewer system qualified as a "tax" within the meaning of a constitutional provision that conferred jurisdiction over tax cases to the superior courts. "A tax, in the general sense of the word, includes every charge upon persons or property, imposed by or under the authority of the legislature, for public purposes." (*Id.* at p. 310, citing *Perry v. Washburn* (1862) 20 Cal. 318, 350, *People v. McCreery* (1868) 34 Cal. 432, 454.) The sewer charge, we said, "was a charge upon persons; it was imposed by the legislative authority of the city of Madera for public purposes, and under these definitions it was a tax . . . ." (*City of Madera*, at p. 310.)[5]

---

at p. 714, cols. 1–2; see *City of San Luis Obispo v. Pettit* (1891) 87 Cal. 499, 503 [the words " 'assessing and collecting' . . . include[d] the operation called levying the tax," in what was then Cal. Const., art. XI, § 12].) Wilde notes the term "levy" was also sometimes used to refer to the seizure of property to satisfy a judgment or debt, but this is plainly not the sense in which the term is used in article II, section 9. (See, e.g., *Geiger*, *supra*, 48 Cal.2d at pp. 839–840 [exemption for "statutes providing for tax levies" in art. II, § 9 applies to sales tax measures].)

[5] Having assured itself of the lower court's jurisdiction, we went on to invalidate the sewer charges because they were being used to generate general revenue without legislative authorization to do so. (*City of Madera*, *supra*, 181 Cal. at pp. 311, 313–314.) Wilde argues that the fact the revenue was being used for general purposes was critical to our determination that the charges qualified as taxes. But our

Municipal water rates fall well within this broad understanding of the term "tax." Article XIV, section 1, of the 1879 Constitution stated that "[t]he use of all water" was a "public use" and that water rates were to be set by local government authorities. (See *People v. Stephens* (1882) 62 Cal. 209, 233–234.) And in October 1911, in the same election in which voters approved the right to referendum, voters amended the Constitution to empower municipalities to establish "public works" to provide "public utilities," including water. (Cal. Const., former art. XI, § 19; see *Clark v. Los Angeles* (1911) 160 Cal. 30, 47; see also *German Sav. etc. Soc. v. Ramish* (1902) 138 Cal. 120, 124 [referring to charges imposed to pay for public works as tax levies].) The provision of water was understood to be a public purpose, so water rates would have been classified as "taxes" as *City of Madera* interpreted the term.

*City of Madera* does not stand alone. Several cases from around the same time reflect a similarly broad understanding of the term "tax" as used in various provisions of California law. (See, e.g., *Yosemite L. Co. v. Industrial Acc. Com.* (1922) 187 Cal. 774, 783 [reiterating the public purpose definition of "tax" from *City of Madera* and concluding that a mandatory workers' compensation payment to the state was a tax]; cf. *German Sav. etc. Soc. v. Ramish, supra,* 138 Cal. at p. 124 ["The power to levy a tax for general purposes, which shall be a lien superior to all other liens, prior or otherwise, is not doubted, and it is not because it is called a tax, but because of its object and the necessity for raising revenue in order to execute the functions of

opinion says nothing of the sort; it says only that the charges qualified as taxes because they were imposed for "public purposes." (*Id.* at p. 310.)

government"]; *Wood v. Brady* (1885) 68 Cal. 78, 80 [defining a tax as "a public imposition, levied by authority of the government, upon the property of the citizen generally, for the purpose of carrying on the government"]; *People v. Parks* (1881) 58 Cal. 624, 639 [characterizing drainage and irrigation as a "public purpose in which the public may be interested" and explaining that "promot[ing] a public purpose by a tax levy upon the property in the State . . . is within the power of the Legislature"]; *Engineering etc. Co. v. East Bay M. U. Dist.* (1932) 126 Cal.App. 349, 365–366 ["the power of taxation is regarded as a most important and essential attribute of a public corporation or utility in order that there may be the ability to function generally and freely under exigencies and situations that may present themselves"].)

Based in large measure on this body of precedent, the Court of Appeal would later opine that other municipal utility charges, not unlike the water rates at issue here, were subject to the taxation exception to the referendum in article II, section 9. (See *Dare v. Lakeport City Council* (1970) 12 Cal.App.3d 864, 868 (*Dare*) [concluding sewer rates are subject to the exception]; cf. *Fenton v. City of Delano* (1984) 162 Cal.App.3d 400, 403–407 [discussing *Dare* and holding that a city fee on users of gas, electricity, phone, and cable television utilities was a tax measure exempt from referendum].)[6] Although we are not

---

[6] In *Dare*, the Court of Appeal concluded that because sewer rates are taxes under *City of Madera* and therefore exempt from referendum under the referendum provision in the Constitution, voters were barred from challenging new sewer rates by initiative as well. (*Dare, supra*, 12 Cal.App.3d at pp. 868–869.) This court later overruled this holding, explaining that an

bound by these characterizations, they lend further credence to the conclusion that the water rates at issue here fall within the range of possible meanings of the term "tax" in the referendum provision, even if they do not reflect the only plausible interpretation of the term.

Wilde disagrees. According to Wilde, by the time the referendum provision was added to the Constitution in 1911, the law already distinguished between "taxes" and "fees" in much the same way articles XIII C and XIII D do now, following passage of Proposition 218. The term "tax," Wilde argues, was narrowly understood to refer to a compulsory exaction designed to raise revenue for general government expenses. A charge in exchange for a particular benefit or service, like the water rates in this case, instead would have been denominated a "fee" — unless, of course, it was excessive relative to the reasonable costs of providing a service, in which case it would have been

---

initiative that repeals a tax prospectively is "*not* the 'functional equivalent' of a referendum." (*Rossi, supra,* 9 Cal.4th at p. 711, italics added.)

Wilde asserts that *Dare* is no longer good authority after *Rossi*, even for the limited proposition that sewer rates are taxes exempt from referendum. Wilde highlights language in *Rossi* stating, in passing, that *Dare* did not involve the "repeal of a tax." (*Rossi, supra,* 9 Cal.4th at p. 708.) This was true insofar as the initiative measure at issue in *Dare* would have amended the rates at issue, not "repealed" them. But *Rossi* did not address whether the sewer rates were taxes for any purpose. We thus disagree with Wilde's suggestion that *Rossi* rejected *Dare*'s characterization of the sewer rates as a tax or casually overruled the authorities on which *Dare* relies for that conclusion, including *City of Madera. Rossi* simply did not address the issue.

deemed a "tax" in disguise. In support of her argument, Wilde cites various cases that use the term "tax" in a range of unrelated contexts. (See, e.g., *County of Plumas v. Wheeler* (1906) 149 Cal. 758, 761–765 [explaining that a regulatory business license fee was a permissible exercise of the county's police power, not a statutorily prohibited tax for revenue-raising purposes, as long as the amount of the fee was reasonable given its purpose]; *Fatjo v. Pfister* (1897) 117 Cal. 83, 84–85 [invalidating legislation increasing filing fees for county clerk inventory and appraisal of high-value estates as an unauthorized property tax]; *The People v. Naglee* (1850) 1 Cal. 232, 252–254 [charge on foreigners operating gold mines was not a "tax" within the meaning of constitutional provision mandating that taxation be uniform throughout the state]; *Oakland v. E. K. Wood Lumber Co.* (1930) 211 Cal. 16, 25–26 [fee imposed in city's proprietary capacity for service of providing wharves for use of vessels was not an unconstitutional duty on tonnage]; *Arcade County Water Dist. v. Arcade Fire Dist.* (1970) 6 Cal.App.3d 232, 240 [allowing water district to impose water rates on fire district as a "charge for services rendered," and rejecting argument that the charge was disallowed as a "tax" by one governmental entity upon another]; cf. *Western Indemnity Co. v. Pillsbury* (1915) 170 Cal. 686, 700 [comparing a mandatory workers' compensation payment requirement for employers that had "some of the characteristics of a tax" with a requirement that an employer pay for an insurance-like workers' compensation scheme].)

The law certainly drew such distinctions for some purposes. But did it draw the same distinction for every purpose, including for purposes of referendum? None of the cases says so. Nor do the other authorities on which Wilde

relies, most of which refer in passing to both "water rates" and "taxes" without ever suggesting that water rates and taxes were uniformly considered to be mutually exclusive categories. (See *Henderson v. Oroville-Wyandotte Irr. Dist.* (1931) 213 Cal. 514, 532 [noting that the cost of water in a water district included both "the acre-foot rate charged all water users" and other "taxes and assessments" without referencing the referendum power]; *Shelton v. City of Los Angeles* (1929) 206 Cal. 544, 551 [noting, in the context of a different constitutional provision and a dispute about municipal authority to incur debt, that even though a city's water rates would be used to repay debt issued to fund the city's water system, the debt was not being paid using "moneys derived from taxation"]; *South Pasadena v. Pasadena Land etc. Co.* (1908) 152 Cal. 579, 593 [describing a city's administration of a public utility as a "proprietary and only *quasi*-public" activity in a different context, without discussion of taxes or fees]; Stats. 1911, ch. 671, §§ 22–24, pp. 1300–1301 [addressing, in a distinct statutory context, municipal water districts' authority to set "rate[s]" to pay operating expenses and levy "tax[es]" to cover outstanding bond payments].)[7]

---

[7] Similarly, the 1948 Legislative Counsel's interpretation of the term "revenue acts" in a separate provision of the Constitution as covering "every kind of tax, fee, or charge imposed and collected for the support of the State Government" does not establish that, for purposes of the referendum provision, the word "tax" could not encompass what Wilde would categorize as a "fee." (Ops. Cal. Legis. Counsel, No. 197 (Mar. 15, 1948) Consideration of Revenue Acts at Budget Sessions, 1 Assem. J. (1948 Reg. Sess.) p. 388.)

## C.

Given the wide range of uses of the term "tax," it is plausible that the water rates at issue here qualify as taxes for some constitutional purposes. Whether they qualify as taxes for the particular purpose in question here requires a closer examination of article II, section 9. In *City of Madera*, we adopted a broad definition of "tax" in light of the purpose of the jurisdictional provision at issue: "to give to the sovereign power of the state, whether exercised generally or locally, the protection of having the legality of any exaction of money for public uses or needs cognizable in the first instance in the superior courts alone." (*City of Madera, supra*, 181 Cal. at p. 311.) "In view of this purpose," we said, "it is apparent that the words used should be applied in their broadest sense with respect to moneys raised for public purposes or needs." (*Ibid.*) Likewise here, the proper understanding of the scope of the taxation exception to referendum requires close attention to the purpose of the exception.

We have previously explained that "[o]ne of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies." (*Geiger, supra*, 48 Cal.2d at pp. 839–840.) Referendum, we have explained, poses a distinct potential for disruption that sets it apart from the ordinary legislative process. To give voters an opportunity to propose referendum measures, all legislative enactments subject to referendum must wait some period of time before they take effect. At the state level, all nonexempt measures must wait 90 days; the Constitution imposes

19

additional restrictions on when nonexempt measures may be passed by the Legislature.  (See Cal. Const., art. IV, § 8, subd. (c)(1); *id.*, art. II, § 9, subd. (b) [referendum measure may be proposed within 90 days after the enactment date of the statute]; *id.*, art. IV, § 10, subd. (c) ["No bill may be passed by either house on or after September 1 of an even-numbered year except statutes calling elections, statutes providing for tax levies or appropriations for the usual current expenses of the State, and urgency statutes, and bills passed after being vetoed by the Governor"].)[8]  Similar rules apply to referenda at the city and county levels.  (Elec. Code, § 9141 [county ordinances other than those subject to certain exceptions become effective 30 days after passage]; *id.*, § 9235 [same for municipal ordinances].)  By contrast, measures that are exempt from referendum may be enacted at any time and take effect immediately.  (Cal. Const., art. IV, § 8, subd. (c)(3); see *Rossi, supra*, 9 Cal.4th at p. 703.)

Article II, section 9's exemptions from referendum reflect a recognition that in certain areas, legislators must be permitted to act expediently, without the delays and uncertainty that accompany the referendum process.  All of the exemptions — for urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current

---

[8]    The same was true under article II, section 9 as it was originally enacted.  (Cal. Const., former art. IV, § 1 ["No act passed by the legislature shall go into effect until ninety days after the final adjournment of the session of the legislature which passed such act, except acts calling elections, acts providing for tax levies or appropriations for the usual current expenses of the state, and urgency measures necessary for the immediate preservation of the public peace, health or safety, passed by a two-thirds vote of all the members elected to each house"].)

expenses of the state — are for "measures having special urgency, a delay in the implementation of which could disrupt essential governmental operations." (*Rossi*, *supra*, 9 Cal.4th at p. 703.) For this reason, " '[i]f essential governmental functions would be seriously impaired by the referendum process, the courts, in construing the applicable constitutional and statutory provisions, will assume that no such result was intended.' " (*Ibid.*, quoting *Geiger*, *supra*, 48 Cal.2d at p. 839; see also *McClure v. Nye* (1913) 22 Cal.App. 248, 251 (*McClure*) [describing the exceptions to the referendum as "ample enough to prevent any menace to the public welfare by reason of such delay incidental to a submission to popular vote"].)

In *Geiger*, we elaborated on these principles as applied to tax measures. We held that a statute providing for a system of local sales and use taxes was exempt from referendum, explaining that allowing a referendum on these taxes would hamstring the ability of counties to budget and manage their fiscal affairs. (*Geiger*, *supra*, 48 Cal.2d at p. 840; accord, *Hunt v. Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 628–630 [sales tax exempt from referendum].) We later summarized the principles as follows: "[I]f a tax measure were subject to referendum, the county's ability to adopt a balanced budget and raise funds for current operating expenses through taxation would be delayed and might be impossible. As a result, the county would be unable to comply with the law or to provide essential services to residents of the county." (*Rossi*, *supra*, 9 Cal.4th at p. 703.) An initiative, by contrast, would have no such effect: Because an initiative does not delay or suspend the operation of statutes or ordinances, "[p]assage of an initiative which repeals an existing tax will rarely affect the current budgetary process of a local government." (*Ibid.*)

These cases explain why article II, section 9 exempts the sorts of exactions that fall within Wilde's narrow conception of taxes — that is, compulsory general-purpose exactions such as sales taxes and income taxes. Each represents a source of revenue on which government depends for its essential operations. But the rationale underlying these cases is not limited to such exactions. Local governments also depend on other types of exactions to perform their essential functions, and subjecting such exactions to referendum would be no less disruptive to their operations. Here, the City depends on water charges to provide water to residents and to maintain the infrastructure necessary to do so. Even the temporary suspension of a rate-setting resolution would run the risk of undermining the City's ability to finance its water utility and manage its fiscal affairs. The result would be to impair the City's ability to carry out one of its most basic and essential functions. The potential for disruption from subjecting water rates to referendum is at least as significant as the disruption that results from temporarily suspending an increase in the sales tax. (See *Geiger, supra*, 48 Cal.2d at pp. 839–840.) It follows from our cases that charges used to fund a city's provision of water, like other utility fees used to fund essential government services, are exempt from referendum.[9]

---

[9]     The rule we apply here is related to, but distinct from, the rule we articulated and applied in *Simpson v. Hite* (1950) 36 Cal.2d 125. In *Simpson*, we granted a request for a writ of mandate that sought the removal of a proposed initiative from the ballot. The initiative would have repealed and replaced a county board of supervisors' selection of a site for local courthouses. (*Id.* at pp. 127, 135.) As we explained, the

It may be the case, as the Court of Appeal below observed, that the City would not be entirely without recourse should Wilde's referendum succeed. Perhaps the City could simply default to its prior rates while it restarts the process of "study[ing], plan[ning], and implement[ing] a new water rate master plan." (*Wilde*, *supra*, 29 Cal.App.5th at p. 179.) But the exceptions to referendum do not exist solely to shield governments from certain and immediate disaster. From the standpoint of the Constitution's referendum provision, the gradual disrepair of a fundamental government service is as much a cause for concern as a wholesale shutdown. Leaking

---

Legislature had required, by state statute, that the county board of supervisors "provide suitable quarters for the municipal and superior courts," and voters could not "nullify th[is] legislative policy" by way of an initiative. (*Id.* at pp. 129, 133.) To allow otherwise would be to permit the use of the initiative or referendum to " 'impair or wholly destroy the efficacy of some other governmental power.' " (*Id.* at p. 134, quoting *Chase v. Kalber* (1915) 28 Cal.App. 561, 569–570.)

The City relies on *Simpson* for the broad proposition that the powers of direct democracy are not to be interpreted to defeat essential government functions. But in *Simpson*, we invoked the essential government services reasoning not to effectuate the express exceptions in the referendum provision of the Constitution, but to foreclose the operation of the initiative or referendum where it would conflict with the Legislature's express delegation of authority to a local government. (See *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 776 [describing *Simpson* as concluding that "the initiative and referendum power could not be used in areas in which the local legislative body's discretion was largely preempted by statutory mandate"].) No similar exclusive delegation argument has been raised here. Nonetheless, for reasons given above, whether allowing referendum would impair essential government functions is a critical consideration in interpreting the scope of article II, section 9's taxation exemption.

water pipes and aging water tanks only last for so long. The City will inevitably need to raise the funds required for the operation, repair, and upkeep of its utilities, just as it would for any other essential government service. Waiting to institute new water rates until a successful referendum runs the risk of forcing the City to wait too long. The purpose of the taxation exception in article II, section 9 is to alleviate that risk.

Wilde makes various additional arguments as to why the water rates should not be counted as taxes for purposes of the exemption in article II, section 9, but none is persuasive. First, Wilde argues that the water rates are disqualified because the proceeds from the water charges are not deposited in the City's general fund and used for the general operation of the City. But into what specific accounts the money goes, and whether it funds general operations, are not article II, section 9's concern. It suffices that the money goes to the City to fund an essential governmental function — namely, the provision of water. Nor does it matter, for purposes of our analysis, that water is sometimes provided by private companies rather than local governments; when a local government undertakes to provide water, the rates it sets are exempt from referendum in the same manner as other taxation measures.

Wilde also asserts that "taxes are no longer protected from the delay that a referendum election would entail" because they are subject to preapproval under article XIII C, which requires any new tax under that article to be approved by either a majority or two-thirds of voters before taking effect (art. XIII C, § 2). The same is true for most fees and charges under article XIII D. (Art. XIII D, § 6, subd. (c).) Because so many exactions are already subject to what Wilde calls a " 'referendum' of

sorts,"[10]  Wilde argues that there is no reason they should be insulated from an actual referendum under article II, section 9. But a preenactment vote does not suspend the operation of new rates in the same way as a postenactment challenge.  Nor, in any event, is every exaction subject to a preapproval vote; the water rates at issue here, for example, are not.  (Art. XIII D, § 6, subd. (c).)  And at any rate, these preapproval requirements do not affect our interpretation of the referendum provision that long predated passage of Proposition 218.

It is true, as Wilde emphasizes, that it is " 'the duty of the courts to jealously guard this right of the people' " to the initiative and referendum, such that ordinarily " '[i]f doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it.' " (*Associated Home Builders etc., Inc. v. City of Livermore, supra*, 18 Cal.3d at p. 591.)  But "when taxes levied to support essential governmental services arguably are involved in a referendum, the general rule requiring that referendum provisions be liberally construed to uphold the power is inapplicable." (*Rossi, supra*, 9 Cal.4th at p. 703; see also *Geiger, supra*, 48 Cal.2d 832, 839–840.)  That is the case here.

Finally, Wilde points to a handful of fees that have been the subject of referenda at various points in time, ranging from an "oleomargarine fee" on the ballot in 1926 (which sought to "regulate[] the manufacture and sale of oleomargarine" and

---

[10]    "[O]f sorts," but not in fact.    (See *Consolidated Fire Protection Dist. v. Howard Jarvis Taxpayers' Assn.* (1998) 63 Cal.App.4th 211, 225–226; see generally *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 247–254.)

required oleomargarine dealers to pay a fee (Ballot Pamp., Gen. Elec. (Nov. 2, 1926) summary of measure, p. 6)) to a "plastic bag fee" put to the voters in 2016 (which would bar single-use plastic bags and impose a charge on the use of certain bags in stores (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) analysis of Prop. 67 by Legis. Analyst, pp. 110–113)). But Wilde points to no historical practice of subjecting exactions like the water charges at issue here to referendum. Whether other exactions were similarly levied to fund essential government functions — a question we need not answer here — the water charges at issue are.[11] The resolution imposing the charges therefore qualifies as a tax measure within the meaning of the exception to the referendum power in article II, section 9.[12]

### D.

Whether this is the end of the inquiry, however, turns on another question of constitutional interpretation. Recall that the taxation exception to the referendum is framed as follows: "The referendum is the power of the electors to approve or reject statutes or parts of statutes except . . . statutes providing for tax levies or appropriations *for usual current expenses* of the State." (Art. II, § 9, subd. (a), italics added.) Even if the water rates at issue here qualify as taxes, Wilde says, they must be taxes "for

---

[11] We do not hold that every government revenue-raising measure is necessarily exempt from referendum; our holding is limited to utility fees on which local governments depend to provide essential services to their residents.

[12] We disapprove of *Bock v. City Council* (1980) 109 Cal.App.3d 52 to the extent it conflicts with our reasoning here.

usual current expenses" to be exempt from referendum, and these rates are not.[13]

We identified this very issue without resolving it in *Geiger*. We noted there that while several cases had "assumed without discussion" that "tax levies must be for usual current expenses in order to be exempt from referendum," there were arguments to the contrary. (*Geiger, supra,* 48 Cal.2d at p. 836, fn. *.) We pointed in particular to a Legislative Counsel opinion dated June 27, 1947, that had concluded that the phrase " 'for the usual current expenses' " did not modify " 'tax levies,' " based "on the ballot argument, on contemporaneous construction at the 1913 session of the Legislature, and on the continuous practice of making state taxes effective immediately regardless of use of the proceeds therefrom for capital outlay as well as usual current expenses." (*Geiger*, at p. 836, fn. *.) But we left the question open, explaining that the revenue from the tax ordinance at issue in *Geiger* was undisputedly to be used for current expenses. (*Id.* at p. 836 & fn. *.) We have not revisited the issue since. (See *Rossi, supra,* 9 Cal.4th at p. 730 (dis. opn. of Mosk, J.).)

Again confronted with the issue in this case, we now conclude the taxation exception from referendum is not limited to tax measures "for usual current expenses." As a very general rule, we understand a qualifying phrase to apply only to the word or phrase that immediately precedes it and not to other words or phrases that appear earlier in a list or series. (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680; accord,

---

[13]    Although Wilde did not raise this question in her initial briefing, we sought supplemental briefing in order to provide a full response to the issue presented.

*Lockhart v. United States* (2016) ___ U.S. ___, ___–___ [136 S.Ct. 958, 963–964].) Under this "last antecedent rule," we would understand the qualifying phrase "for usual current expenses" to modify its immediate antecedent — "appropriations" — and not the earlier-appearing phrase "tax levies."

Of course like all such interpretive rules, the last antecedent rule has its exceptions, such as when the qualifying language applies just as naturally to the earlier items in a list as the later items. (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743.) But that is not the situation at hand. Here it is far more natural — and makes far more practical sense — to read "for usual current expenses" as applying only to "appropriations" than it does to read it as applying to both "appropriations" and "tax levies." Taxpayers typically pay certain sums to the government on the basis of income, property, purchases, or services used; quite often, taxpayers have no guarantee as to how those funds will be deployed, whether for usual or unusual matters. Even if some exactions may be levied for a specific purpose identified in advance, that is hardly the case for *all* exactions. Governments routinely raise tax revenue first and allocate it to various ends afterward. Indeed, in the early twentieth century, some of the largest pools of tax revenue, often from sources such as property taxes, were not tethered to specific expenditures. (See Cal. Tax Com., Final Rep. (Mar. 5, 1929) table I-2, pp. 16–17 [listing the major categories of state tax revenue in 1911]; see also *id.* at pp. 14–16.) In those cases, classifying taxes based on whether they are "for usual current expenses" would have been an unwieldy, if not impossible, task.

The same is not true of appropriations. Legislative bodies cannot spend money without first designating the purpose of the expenditure. (58 Cal.Jur.3d (2012) State of California, § 80,

p. 257 ["In the context of the appropriation requirement of the state constitution, an 'appropriation' is a legislative act setting aside a certain sum of money for a specified object in such manner that the executive officers are authorized to use that money and no more for such specified purpose"]; The Cal. Municipal Law Handbook (Cont.Ed.Bar 2019) § 5.276 ["A specific appropriation is an act by which a named sum of money is set apart in the treasury and made available for the payment of particular claims or demands.  The city may accomplish this by adopting a budget or passing an appropriations ordinance or resolution"].)  Against this backdrop, the enactors of the referendum provision would have understood the qualifying "usual current expenses" language to apply in a straightforward manner to appropriations measures, which could be distinguished on such a basis, but would have had no similar understanding about tax bills.

What evidence exists of contemporaneous understandings of the referendum provision reinforces the conclusion that the taxation exception is not limited to taxes for usual current expenses.[14]  Most pertinently, in 1913, the chair of the Senate Committee on the Judiciary submitted a report to the Senate on the interpretation of the referendum provision.  (1 Sen. J. (1913 Reg. Sess.) p. 226.)  The chair at the time, Senator Lee Gates, had helmed the committee that had drafted the referendum

---

[14]  Despite best efforts, we have been unable to locate a copy of the 1947 Legislative Counsel opinion cited in *Geiger*, which evidently reviewed various contemporary sources to conclude that the taxation exception is not limited to taxes for usual current expenses.  (See *Geiger, supra*, 48 Cal.2d at p. 836, fn. *.)  Our own review of contemporary sources, however, leads us to the same conclusion.

provision. Senator Gates's report described the four categories of legislation that could take effect immediately upon a two-thirds vote of each house, without being subject to referendum: "Acts calling elections. Acts providing for tax levies. Acts providing for appropriations for the usual current expenses of the State. [A]nd urgency measures necessary for the immediate preservation of the public peace, health or safety." (*Ibid.*) The report stated that "any Act of the first three classes, to wit, an Act calling an election, or an Act providing for a tax levy, or an Act providing an appropriation for the usual current expenses of the State, have in such Act a section substantially in words and figures as follows: 'This Act, inasmuch as it * * * shall under the provisions of [the referendum provision] take effect immediately.'" (*Ibid.*) In enumerating the exceptions to the referendum this way, the report made clear that "for usual current expenses" modifies "appropriations" and not "tax levies."[15] (See also, e.g., Ops. Cal. Legis. Counsel, No. 341 (Dec.

---

[15] The occasional legislative assertion that a tax bill is exempt from referendum "inasmuch as it provides for a tax levy for the usual current expenses of the state" does not alter our analysis (e.g., Stats. 1913, ch. 596, § 5, p. 1086), since there is no evidence that these legislative pronouncements constitute considered constitutional analysis (*McClure*, *supra*, 22 Cal.App. at pp. 251–252).

For the same reason, the language of Government Code section 36937 does not resolve the inquiry. This provision, enacted in 1949, lists the types of city ordinances that can take immediate effect (instead of 30 days after final passage) and includes ordinances "[r]elating to taxes for the usual and current expenses of the city." (Gov. Code, § 36937, subd. (d).) This language does not affect our analysis. Not only does the Legislature not have the power to limit the application of the

13, 1949) Enactment of Bills to Take Effect Immediately, 2 Assem. J. (1949 1st Ex. Sess.) pp. 156–157 [listing the four categories of legislation exempt from referendum in similar fashion].)

## III.

The California Constitution reserves the power of referendum to voters with specific exemptions for certain kinds of legislative enactments. The City's water rates, adopted in the Resolution at issue here, fall within the exemption for "tax levies" and therefore are not subject to referendum. We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

---

constitutional exemptions to the referendum (*Geiger, supra,* 48 Cal.2d at pp. 836–837), but a statute enacted nearly 40 years after the referendum provision is also of limited value in understanding the contemporaneous meaning of the constitutional provision. Notably, the statute that preceded Government Code section 36937, and on which it was based, contained an exception from the usual rule that ordinances take immediate effect for measures "fixing the amount of money to be raised by taxation, or fixing the rate or rates of taxes to be levied," with no additional limiting language. (Stats. 1947, ch. 747, § 2, subd. (d), p. 1801.)

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Wilde v. City of Dunsmuir

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XX 29 Cal.App.5th 158
**Rehearing Granted**

_____

**Opinion No.** S252915
**Date Filed:** August 3, 2020

_____

**Court:** Superior
**County:** Siskiyou
**Judge:** Anne Bouliane

_____

**Counsel:**

Howard Jarvis Taxpayers Foundation, Jonathan M. Coupal, Trevor A. Grimm, Timothy A. Bittle, Laura E. Dougherty; and Leslie T. Wilde, in pro. per., for Plaintiff and Appellant.

Jack Cohen as Amicus Curiae on behalf of Plaintiff and Appellant.

Kenny, Snowden & Norine, Kenny & Norine, John Sullivan Kenny, Linda R. Schaap and Rob J. Taylor for Defendants and Respondents.

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Conor W. Harkins for Association of California Water Agencies, California Association of Sanitation Agencies, California State Association of Counties, California Special Districts Association and League of California Cities as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Timothy A. Bittle
Howard Jarvis Taxpayers Foundation
921 Eleventh St., Suite 1201
Sacramento, CA 95814
(916) 444-9950

John Sullivan Kenny
Kenny & Norine
1923 Court St.
Redding, CA 96001
(530) 244-7777

Michael G. Colantuono
Colantuono, Highsmith & Whatley, PC
420 Sierra College Dr., Suite 140
Grass Valley, CA 95945-5091
(530) 432-7357